## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STREAM COMPANIES, INC.,       :

           Plaintiff,    :

      v.           :

WINDWARD ADVERTISING,      :
CORY LORENZ, & MICHAEL CRESTA, :

           Defendants.   :

12-CV-_____

### ORDER

AND NOW, this _____ day of August 2012, upon consideration of Plaintiff Stream Companies, Inc.'s ("Stream") Motion for Preliminary Injunction, **IT IS HEREBY ORDERED THAT** the Motion is **GRANTED**:

     1.    Stream Companies, Inc. has made a sufficient showing that preliminary injunctive relief is appropriate.

         a.    There is a reasonable probability of success on the merits.

             i.   The Court finds a reasonable likelihood of success as to Stream's Computer Fraud and Abuse Act claims in that the Court has seen sufficient evidence that Defendants took electronic information from Stream's computers without authorization, causing at least $5000 in loss and using the information to compete unfairly against Stream;

    ii.   The Court finds a reasonable likelihood of success as to Stream's copyright claims as the Court has seen sufficient evidence that Stream has registered copyrights that Defendants copied;

    iii.   The Court finds a reasonable likelihood of success as to Stream's trade secret claim as the Court has seen sufficient evidence that Defendants converted and disclosed trade secret information, such as client lists with pricing, rate, and return on investment date information, as well as other pricing and creative works; and

    iv.   The Court finds a reasonable likelihood of success as to Stream's breach of loyalty claim in that there exists sufficient evidence that Lorenz and Cresta, during and after employment with Stream, improperly used Stream information to compete against Stream.

b.  Stream has shown that the disclosure of its confidential, proprietary, and trade secret information will irreparably harm it in addition to the irreparable harm presumed by Defendants' unauthorized use of Stream's copyrighted materials.

c.  The Court finds that restraining Defendants from soliciting or doing business with the identified and prospective Stream clients (Exhibits A and B) will not cause greater harm to Defendants as the advertising market is a sizable market in which Stream's current and prospective clients are a small percentage.

d.  Protecting Stream's copyrights and electronic information as well as assuring fair competition in the marketplace serves the public interest.

2.      Windward Advertising, Cory Lorenz, and Michael Cresta are preliminarily restrained from contacting, soliciting, or performing advertising services for the companies identified in the attached lists (Exhibits A and B);

3.   Windward Advertising, Cory Lorenz, and Michael Cresta are preliminarily restrained from using any and all documents, materials, data, lists, electronic information, graphics, marketing boards, and  marketing decks that originated from Stream or were accessed or copied while Lorenz or Cresta were Stream employees;

4.   Windward Advertising is preliminarily restrained from using any information obtained from Cory Lorenz or Michael Cresta prior to July 28, 2012 regardless of whom Windward believes is the original author/source of that information;

5.   Defendants may not use or disclose any of Stream's information at issue until further Order of this Court; and

6.   A hearing on Stream's Motion for a Final Injunction is set for _____, _____, 2012, at _____m., in courtroom _____.

_____
                                              U.S.D.J.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| STREAM COMPANIES, INC., | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | :     12-CV-_____ |
| WINDWARD ADVERTISING, | : |
| CORY LORENZ, & MICHAEL CRESTA, | : |
| | : |
| Defendants. | : |

## PLAINTIFF STREAM COMPANIES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Stream Companies, Inc. seeks equitable relief to enjoin the ongoing and irreparable harm being caused by Defendants Windward Advertising, Corey Lorenz, and Michael Cresta (collectively "Defendants"). While employed by Stream, Lorenz and Cresta improperly and inappropriately acquired Stream's confidential and proprietary information, including trade secrets and copyrighted materials. Defendants obtained this information through the unauthorized access and copying of electronic data in violation of the Computer Fraud and Abuse Act. Defendants' misconduct is ongoing, and continues to cause irreparable harm to Stream. Thus, pursuant to Federal Rule of Civil Procedure 65, Stream is entitled to immediate injunctive relief to enjoin Defendants' ongoing transgressions, to protect its confidential, proprietary, and trade secret information, and to restore fair competition between competing advertising agencies.

As there are thousands of potential clients in the Philadelphia region that need advertising services, Stream's requested relief is narrowly tailored as it allows Windward, Lorenz, and

Cresta to continue to compete in the advertising market but without the aid of information they improperly took from Stream.

For the reasons set forth in the accompanying Memorandum of Law supported by the affidavit of Louis Cinquanto, and the reasons set forth in the verified Complaint, Stream respectfully requests that this Court enter an Order enjoining Defendants' misconduct and compelling the immediate analysis of electronic storage devices in Defendants' possession and return of Stream's proprietary and confidential information, data, and trade secrets.

Respectfully submitted,


/s/ Frank R. Emmerich, Jr.
Frank R. Emmerich Jr., Esquire
Kyle M. Elliott, Esquire
Conrad O'Brien PC
1500 Market Street
Suite 3900, West Tower
Philadelphia, PA 19102-2100
femmerich@conradobrien.com
kelliott@conradobrien.com


Dated: August 10, 2012

2

## CERTIFICATE OF SERVICE

I, Frank R. Emmerich Jr., hereby certify that, on the date set forth below, I caused a true and correct copy of Plaintiff Stream Companies, Inc.'s Motion for Preliminary Injunction, and Memorandum of Law in support thereof, to be served via email and regular mail to Mark T. Sophocles, Esquire, counsel for Defendants, mark.sophocles@verizon.net, 21 Industrial Blvd, Suite 201, Paoli, PA 19301.

/s/ Frank R. Emmerich, Jr.

Frank R. Emmerich Jr.

Dated: August 10, 2012



# Exhibit A: Stream Client List

- Ambler Surgical
- Automotive Training Center
- Baker Jeep
- Battery Depot
- Benari Jewelers
- Burlington Chevy
- Burlington Kia
- Burlington VW
- Cabrini College
- Campbell Fittings
- Carlino's Market
- Causeway Auto Group
- Cavalier Auto Group
  - o  Cavalier Ford Chesapeake Square
  - o  Cavalier Ford Lincoln - Greenbriar
  - o  Cavalier Mazda
- Central Ave Dodge, Chrysler Jeep
- Century Ford DCJ
- Century Ford
- CertainTeed
- Cherry Hill Nissan
- Chrysler Jeep 24
- Colonial Electric Supply
- Comcast Spotlight
- Contract Callers, Inc.
- Cottman Transmission
- Dalesio Auto Group
- Dayton Toyota
- Diageo
- EuroMotorcars Devon
- Firestone/Bridgestone
- Forman Mills
- Fred Beans
  - o  Fred Beans Hyundai
  - o  Fred Beans PARTS
  - o  Fred Beans West Chester
- French Creek Outfitters
- Hackensack Auto Group
- Integrated Communications
- Jack Williams Tires
- Kent Brown Auto Group
- Key Impact Sales and Systems

2

- Kremer Eye Center
- Kunzler Meats
- Land Rover of West Chester
- Lawton Communications
- Lynnes Auto Group
  - Lynnes East
  - Lynnes Hyundai
  - Lynnes Subaru
  - Lynnes West
- Macdonald Motors
- McCafferty Auto Group
- McCafferty Langhorne
- McCafferty Mechanicsburg
- Miliaj Diamounds
- Monarch Med Spa
- Montgomeryville Acura
- Montgomeryville Nissan
- Motorola Solutions
  - Communication Technologies, Inc.
  - Wireless Communications, Inc.
  - D&R Communications LLC
  - Blair Communications, Inc.
  - ComPros, Inc.
  - Red Cloud Wireless Voice & Data
  - Douthit's Radio Service
  - Radio Communications of Charleston, Inc.
  - Macon Communications
  - Altech Electronics, Inc.
  - Commenco, Inc.
  - Leading Edge Wireless
  - Northeast Rural Services, Inc.
  - Scott Communications
  - DataTronics, Inc.
  - Washington Electronics
  - PMC Associates Wireless Communications
  - MK Communications, Inc.
  - Radio Frequency Concepts, Inc.
  - Louisiana Radio Communications, Inc.
  - Systems Communications
  - Champlin Wireless Communications
  - Kohler Communications
  - Tri-County Communications
- New Holland Auto Group
- Newark Toyota World
- Nissan 24

- North Hills Toyota
- Penn Liberty Bank
- Pennsylvania Institute of Technology
- Prestige Family Site
- Prestige Mitsu
- Prestige Subaru
- Prestige VW
- Price Acura
- Price Honda
- Price Toyota
- Rick's Tree Service
- Radio Maintenance, Inc.
- Sands Auto
- Sila Heating & Air Conditioning
- Society Hill Reproductive Medicine
- St. Joseph's University
- Subaru of Morristown
- Termac Corporation
- Toyota of Morristown
- Toyota Universe
- Trend Motors
- Tri-County Lexus
- Vanity Fair
- VF Outlet
- Wayne Ford
- Weis Markets

# B.

## Exhibit B: Stream Active Prospective Client List

- Rafferty Subaru

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| STREAM COMPANIES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | 12-CV-_____ |
| WINDWARD ADVERTISING, | : | |
| CORY LORENZ, & MICHAEL CRESTA, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTIVE RELIEF FILED ON BEHALF OF PLAINTIFF STREAM COMPANIES, INC.

Plaintiff Stream Companies, Inc., by and through its undersigned counsel Conrad O'Brien PC, respectfully files this Memorandum of Law in Support of its Motion for Preliminary Injunctive Relief.

## I.    INTRODUCTION

As demonstrated in its verified Complaint, Stream seeks equitable relief to enjoin the improper and inappropriate conduct of Defendants Windward Advertising, Cory Lorenz, and Michael Cresta, pursuant to the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. Ann. § 5301 *et. seq.*, the Copyright Act, 17 U.S.C. § 101 *et seq.*, and Lorenz's and Cresta's breaches of their duty of loyalty.

This Court should enjoin Defendants from using confidential and proprietary information that Lorenz and Cresta secretly misappropriated from Stream while they were Stream employees. Twenty-four hours after their last day at Stream, Lorenz and Cresta, with Windward's support,

converted business from Stream. Through forensic analysis without the aid of discovery, Stream has identified activity by Lorenz and Cresta in their final days of employment indicative of a plan to compete unfairly post-separation. *See* Compl., Ex. B Cinquanto Aff. ¶¶ 13–14. For example, Lorenz and Cresta emailed Stream documents to a private email account and downloaded Stream data to flash drives, a hard drive, and "cloud" data storage services. Compl. ¶¶ 68, 71–126, 128–32. The data secreted away from Stream includes a complete client list with rate information only known to Stream senior management, information related to a pitch Stream was developing for Rafferty Subaru's business, copyrighted material related to a client converted from Stream to Windward, return on investment data, and other copyrighted materials. *See id.* ¶¶ 83–84, 115, 121, 124–25. This information provided a significant competitive advantage to Windward as a start-up advertising agency.[1] As Defendants used covert means and utilized high volume portable electronic devices, Stream believes this information is a mere sample of the competitive and protected information taken from Stream.

## II.   STATEMENT OF FACTS

Stream Companies, Inc. has grown from a two-person start-up company into one of the top advertising agencies in the Philadelphia region. Compl. ¶ 23. Over its sixteen years of operation, Stream has developed unique marketing strategies and methods of serving its clients, which include Comcast Spotlight, St. Joseph's University, Weis Markets, and Termac/Advantage Storage. *Id.* ¶¶ 23, 29–32, 37–38, 42–44.

Cory Lorenz began working for Stream as a Media Director in February 2010. *Id.* ¶¶ 46–47. Lorenz's responsibilities included management of the media department and strategic media planning. *Id.* ¶ 48. He had no involvement in the creative side of Stream's business, client

---

[1] Stream anticipates that Defendants will attempt to characterize this action as a restrictive covenant case. Stream is not trying to restrain Lorenz and Cresta from competing in the advertising market. It competes fairly with other advertising companies every day. Stream merely is asserting its rights to fair competition.

solicitation, client retention, or advertising. *Id.* ¶¶ 50–51. Stream hired Michael Cresta in September 2009. *Id.* ¶ 52. Cresta served as Stream's VP of Strategic Partnerships. *Id.* ¶ 53. In this position, Cresta sold online display advertising. *Id.* ¶ 54. Similar to Lorenz, Cresta's duties did not involve Stream's creative business, client retention, or advertising. *Id.* ¶¶ 54–57.

In July 2012, Stream was soliciting Rafferty Subaru as a client. *Id.* ¶ 33. It met with Rafferty's senior management team, created solicitation and marketing strategies for Rafferty, and received information from Rafferty concerning its marketing ideas and restrictions. *Id.* ¶¶ 34–35. Lorenz and Cresta had no involvement in the Rafferty pitch. *Id.* ¶¶ 39–40. As of July 27, 2012, Stream had engaged in follow-up discussions with Rafferty, and was awaiting a final decision regarding Rafferty's advertising business. *Id.* ¶ 36.

That same month, Lorenz and Cresta submitted resignation letters to Stream— respectively on July 19, 2012 and July 13, 2012. *Id.* ¶¶ 64, 66. They both indicated in these letters that July 27, 2012 would be their last day of employment. *Id.* During this time period, unbeknownst to Stream, Lorenz and Cresta removed Stream's business information, much of which did not fall within the scope of their employment duties, from Stream's computers. *Id.* ¶¶ 68, 71–126, 128–32. Lorenz used as least two thumb drives and one Western Digital External Hard Drive to download Stream information in July 2012. *Id.* ¶ 77; *see also* Compl. Ex. B. Cinquanto Aff. ¶ 14(f) . He also accessed "Google Drive," a cloud-storage device, from his Stream computer. Compl. ¶ 79; *see also* Compl. Ex. B. Cinquanto Aff. ¶ 14(i). A forensic analysis of Lorenz's computer has shown that Lorenz likely downloaded a billing spreadsheet that detailed the rates that Stream charged all of its clients for services, a billing spreadsheet regarding a client account, a file that contained a quote given to Campbell Fittings, a website

launch schedule, and a digital proposal. Compl. ¶¶ 82–110; *see also* Compl. Ex. B Cinquanto Aff. ¶ 14.

Lorenz also forwarded Stream information to his personal email address while still employed by Stream. Compl. ¶ 112. On July 19, 2012, Lorenz sent information concerning Stream's solicitation of Rafferty to his personal email account, including logos and account guidelines. *Id.* ¶ 115. On July 13, 2012, Lorenz emailed himself contact lists that he developed as a Stream employee. *Id.* ¶ 117. Three days later, he sent direct mail results for Jack Williams Tire, another Stream client, to his Gmail account. *Id.* ¶ 118. On July 17, 2012, Lorenz emailed his Gmail account more Jack Williams Tire information. *Id.* ¶ 119. Finally, on July 19, 2012, Lorenz emailed a direct ad campaign that Stream has copyrighted, more direct mail results, and information regarding Termac/Advantage Storage to his personal Gmail account. *Id.* ¶¶ 121–22, 124.

From May through July 2012, Cresta used at least four portable devices to download information from his Stream computer. *Id.* ¶ 129. For example, the day before tendering his resignation, Cresta plugged a new portable device into this computer while accessing Stream information. *Id.* ¶ 128. He also plugged a smartphone that contained an SB storage card into his computer during this period. *Id.* ¶ 132.

Lorenz and Cresta's last day of employment with Stream was July 27, 2012. *Id.* ¶ 134. The very next day, a Stream employee saw a Facebook posting that linked Lorenz to Windward Advertising. *Id.* ¶ 135. Windward's Facebook page stated it was founded on July 28, 2012, and had landed Rafferty Subaru as a client. *Id.* ¶¶ 136–37. It also implies that Windward has signed Termac/Advantage Storage as a client. *Id.* ¶ 138.

III.   **ARGUMENT**

    A.    **This Court Should Grant Stream's Motion for a Preliminary Injunction to Stop the Irreparable and Imminent Harm Inflicted on Stream by Defendants' Misconduct.**

Generally, a court must consider four factors when deciding a motion for a preliminary injunction:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Crissman v. Dover Downs Entm't Inc.*, 239 F.3d 357, 364 (3d Cir. 2001) (citation omitted). Courts balance these elements while attempting to minimize the probable harm to legally protected interests between the time of the preliminary injunction and the time of the final hearing on the merits. *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978).

Courts lower the injunction standard, however, for claims brought under federal and/or state statutes that provide for the equitable remedy of injunctive relief. As observed in *United States v. Richlyn Labs., Inc.*, 827 F. Supp. 1145 (E.D. Pa. 1992), "[w]here . . . an injunction is being sought pursuant to a statutory provision, a different standard is to be applied." *Id.* at 1150. "Indeed, because Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action." *Id.* (citing *United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 176 (9th Cir. 1987)); *see also Burlington N. Rail Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074 (9th Cir. 1991) ("The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief.") (citation and quotation marks omitted)). Therefore, "the moving party need show only that probable cause exists to believe

5

that the statute in question is being violated and that there is some reasonable likelihood of future violations." *Richlyn Labs., Inc.*, 827 F. Supp. at 1150; *see also Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir. 1983) ("A copyright plaintiff who makes out a prima facie case of infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm." (citation omitted)).  Pennsylvania state courts subscribe to the same principle. *See, e.g., Unified Sportsmen of Pa. v. Pa. Game Comm'n*, 950 A.2d 1120, 1133 (Pa. Commw. Ct. 2008); *Keller v. Casey*, 595 A.2d 670, 674 (Pa. Commw. Ct. 1991).

Here, the lowered injunction standard applies to Stream's claims. Pursuant to the CFAA, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).  Likewise, under PUTSA, "[a]ctual or threatened misappropriation may be enjoined." 12 Pa. Cons. Stat. Ann. § 5303(a).  The Copyright Act similarly states that any civil court "may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  Stream therefore must show only a substantial likelihood that it will succeed on the merits of its allegations under the CFAA, PUTSA, or the Copyright Act.  Nevertheless, Stream will demonstrate that all of the elements necessitating injunctive relief are present.

### 1. **Stream Has a Reasonable Probability of Prevailing on the Merits.**

A district court need only determine that the moving party has made a prima facie to find that there is a reasonable probability that the moving party will prevail on the merits. *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975).  It is well settled that "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt." *Id.*

(a) CFAA

Various types of conduct give rise to a CFAA violation. First, a person that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer" violates the CFAA. 18 U.S.C. § 1030(a)(2).  A person that "knowingly and with intent to defraud, accesses a protected computer *without authorization, or exceeds authorized access*, and by means of such conduct furthers the intended fraud and obtains anything of value" also violates the CFAA.  *Id.* § 1030(a)(4) (emphasis added). The CFAA broadly defines "computer" as including "high speed data processing device[s]" and "any data storage facility or communications facility[,]" such as email systems  *Id.* § 1030(e)(1); *see also id.* § 1030(e)(2)(B) ("'[P]rotected computer' means a computer . . . which is used in or affecting interstate or foreign commerce or communication'").

For a CFAA violation to give rise to a civil action, the violation must have caused loss of "at least $5,000 in value." *Id.* § 1030(c)(4)(A)(i)(I), (g). "[L]oss" is "any reasonable cost to any victim, including cost of responding to an offense, conducting a damage assessment, and restoring the data, program, systems, or information to its condition prior to the offense." *Id.* § 1030(e)(11).

The CFAA has protected employers from departing employees who use their position to gain information and compete unfairly post-separation. In *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188 (E.D. Wa. 2003), the district court aptly noted:

> Companies frequently find themselves in litigation with former employees who depart to set up shop elsewhere in competition with their former employer.  Such former employees may attempt to gain an edge for their new venture by making use of proprietary information, such as customer lists or trade secrets, obtained with ease of access from their former employer's computer database or workstations that are linked together in a network.

7

*Id.* at 1195–96. The *Pacific Aerospace* court went on to find that an employer's electronic information is vulnerable as an employee can download or store it easily "on a CD or floppy disk" or "*quickly transmit [it] out of the company via e-mail*" before leaving. *Id.* (emphasis added).

Here, Stream can meet its burden of proof as to its CFAA claims because its forensic analysis has revealed that Lorenz and Cresta accessed Stream computers that Stream used in and affecting interstate commerce to transfer Stream's confidential information without authorization. *See* Compl. ¶¶ 71–124. Much of this information falls beyond the scope of their employment. *See id.* ¶¶ 86, 90, 94, 98, 101, 105, 109, 116, 120, 123. Indeed, Lorenz and Cresta went to great lengths to hide the fact that they were downloading data they had no permission to access and take. *See id.* ¶¶ 72–133. If Lorenz ever needed to access Stream's information outside of the office, he had a password to access Stream's computer system remotely. *See id.* ¶¶ 59–60. Stream did not encourage employees to use flash drives or personal email accounts to transfer Stream documents. *See id.* ¶¶ 59, 61. Unbeknownst to Stream, however, throughout July 2012, Lorenz and Cresta systematically secreted away Stream's electronic information by sending emails to private email accounts, downloading information onto a portable hard drive and flash drives, and transmitting Stream information to a "cloud" service. *Id.* ¶¶ 71–133 *see also* Compl. Ex. B Cinquanto Aff. ¶ 14. They did so after tendering their resignations in early July and suggesting that they remain Stream employees until July 27, 2012. Compl. ¶¶ 64, 66, 68. As Lorenz and Cresta were personal friends of Stream's founding members, Stream had no reason to fear that they would breach their duty of loyalty to Stream by using that time to secret Stream information out of its doors. *See id.* ¶¶ 68–69. As set forth in the verified Complaint, this information included:

8

- A list known only to Stream senior management that identified each Stream client and the rates Stream charged for various media placements;

- Confidential pricing information related to media buys;

- Copyrighted materials;

- Confidential pitch information for clients;

- Information related to a pitch to Rafferty Subaru;

- Developed ads related to Termac/Advantage Storage;

- Media pricing for a significant client; and

- Internal pricing, work hour analysis, and quote information for a client.

*Id.* ¶¶ 83–97, 103–10, 115, 117–19, 121–22, 124–25. Accordingly, Lorenz and Cresta accessed and took information from Stream's computers without authorization. Further, where, as here, an employee accesses an employer's computer to misappropriate confidential materials, liability attaches under the CFAA, because Lorenz and Cresta "breach[ed] their duty of loyalty" by improperly transferring Stream's proprietary information. *See Int'l Airport Centers, LLC v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006); *ViChip Corp. v. Lee*, 438 F. Supp. 2d 1087, 1100 (N.D. Cal. 2006). Windward, Lorenz, Cresta, and additional parties to be identified through discovery illicitly have since tried to "gain an edge for their new [Windward] venture" "by making use of [Stream's] proprietary information" that they acquired from Stream's computers. *Pac. Aerospace & Elecs., Inc.*, 295 F. Supp. 2d at 1195–96.

Stream also has suffered significant losses of varying harms as a result of Defendants' conduct. First, Stream incurred internal costs as it diverted employees to determine the possible data that Defendants took. Compl. ¶ 142. Second, upon finding evidence that Lorenz and Cresta misappropriated computer information, it incurred the costs of legal services. *Id.* ¶ 143. Next,

9

Stream incurred the costs associated with a computer forensic investigation. *Id.* ¶ 144; *see also* Compl. Ex. B. Cinquanto Aff. It further incurred harm in segregating Lorenz and Cresta's respective work computers and securing them for investigation, and will incur further costs in remedying the breaches of its computers. *See* Compl. ¶¶ 142, 144.

Further, Stream incurred significant harm to its business due to Defendants' actions. Stream was actively soliciting the business of Rafferty Subaru. *Id.* ¶ 33. While it cannot be said presently whether Stream would have won this account, it is clear that, when Stream was soliciting Rafferty, Defendants were taking information from Stream and using it to assure that Windward would win the contract—which occurred not even one business day after their last day of employment at Stream. *See id.* ¶¶ 134, 137. Lorenz and Cresta, with the support of Windward, also took other information from Stream to assist Windward in other solicitations. *See id.* ¶¶ For example, Defendants have taken proposed print ads and other information related to Stream's former client, Termac/Advantage Storage. *Id.* ¶¶ 124–25. Stream had this client until Defendants improperly competed. *See id.* ¶¶ 124, 138. Other converted information includes data and confidential information that neither Lorenz nor Cresta were responsible for at Stream. *See id.* ¶¶ 86, 90, 94, 98, 101, 105, 109, 116, 120, 123. The great efforts they took to obtain this information and transmit it to Windward provides a strong presumption of its value. Further, courts have found that data, as well as customer lists, are things of value under the CFAA. *See In re Am. Online, Inc.*, 168 F. Supp. 2d 1359, 1380 (S.D. Fla. 2001) ("Because Galaxy has alleged that AOL's actions have interfered with its relationships with its existing customers and potential subscribers, it has alleged that AOL has obtained something of value within the meaning" of the CFAA.). All of the above therefore caused Stream to incur losses well in excess of $5000. *See EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 585 (1st

Cir. 2001) (finding investigative and remedial efforts constitute loss); *In re Am. Online, Inc.*, 168

F. Supp. 2d at 1380 (finding interruptions with current and prospective customers constitute

loss).

Given that Defendants' violations of the CFAA, this Court should grant Stream a

preliminary injunction to prohibit Defendants' misconduct and the irreparable harm it inflicts on

Stream. Defendants continue to utilize misappropriated information and data to Stream's

immediate detriment.

(b) PUTSA

The PUTSA empowers a court to enjoin "[a]ctual or threatened misappropriation" of

trade secrets. 12 Pa. Cons. Stat. Ann. § 5303. Section 5302 defines "trade secret" as:

> Information, including a formula, drawing, pattern, compilation
> including a customer list, program, device, method, technique or
> process that:
>
> (1) Derives independent economic value, actual or potential, from
> not being generally known to, and not being readily ascertainable
> by proper means by, other persons who can obtain economic value
> from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

The misappropriation of a trade secret includes:

> (1) acquisition of a trade secret of another by a person who knows
> or has reason to know that the trade secret was acquired by
> improper means; or
>
> (2) disclosure or use of a trade secret of another without express or
> implied consent by a person who:
> (i) used improper means to acquire knowledge of the trade
> secret;
> (ii) at the time of disclosure or use, knew or had reason to
> know that his knowledge of the trade secret was:
> (A) derived from or through a person who had
> utilized improper means to acquire it;

(B) acquired under circumstances giving rise to a
duty to maintain its secrecy or limit its use; or
(C) derived from or through a person who owed a
duty to the person seeking relief to maintain its secrecy or
limit its use[.]

12 Pa. Cons. Stat. Ann. § 5302; *see also Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. 06-567,

2006 WL 1517382, at *16 (E.D. Pa. May 31, 2006) (holding that an employer's "pricing

mechanisms" as well as its "customer list" are "trade secret[s] protected by the PUTSA [and the

employer] is likely to succeed on the merits of its claim").

In *Christopher M's Hand Poured Fudge, Inc. v. Herron*, 699 A.2d 1272, 1277 (Pa. Super.

Ct. 1997), Pennsylvania's seminal case on trade secrets, the Superior Court of Pennsylvania

affirmed the trial court's grant of a permanent injunction.  The defendant had acquired his former

employer's "fudge recipe and ingredients list," protected trade secrets under PUTSA, as well as

"the unique steps of its fudge manufacturing process during the course of his employment." *Id.*

The defendant misappropriated, *inter alia*, documents and CDs containing "confidential business

information[,]" including: customer lists, vendor lists, quality assurance information, general

management practices, product cost analysis, market analysis, financial reports and projections,

business plans, and documents relating to business negotiations with a potential customer, the

Hershey Foods Corporation. *Id.* at 1274.  Although the defendant and his former employer had

not executed a restrictive covenant or a non-compete agreement, the court *permanently enjoined*

defendant from working in the entire fudge industry. *Id.* at 1276.  Indeed, it held that, "[u]nder

Pennsylvania law, an employee's duty not to use or disclose his employer's trade secrets . . . may

be implied from a confidential employment relationship." *Id.* (citing *Air Prods. & Chems. v.

Johnson*, 442 A.2d 1114, 1120 (Pa. Super. Ct. 1982)).  "Further, an employee cannot use or

disclose trade secrets that he misappropriates from his employer." *Id.* (citing *Belmont Labs., Inc.*

12

*v. Heist*, 151 A. 15, 19 (Pa. 1930)); *see also Doebler's Pa. Hybrids, Inc. v. Doebler Seeds, LLC*, 88 F. App'x 520, 523 (3d Cir. 2004) (affirming preliminary injunction issued by the Middle District of Pennsylvania where defendant left his employer, started his own company, and used his former employer's "own confidential information to compete against [it]").

Lorenz and Cresta did precisely what the *Christopher M's* and *Doebler's* courts found impermissible as they undertook an extensive effort to secret away information from Stream by using a personal email account, a hard drive, flash drives, and a "cloud" service. Compl. ¶¶ 77, 79, 112. Given this level of effort, it is evident that this information was valuable and would provide an unfair competitive advantage to whomever they shared the information with, like Windward. This information includes: rate structures for all clients, media placement rates, return on investment data, and internal documents related to the development of future ad campaigns. *Id.* ¶¶ 83–84, 88–89, 92–93, 96–97, 103–04, 107–08, 115, 118, 121, 124–25. Moreover, in light of the number of thumb drives employed, the use of a hard drive, and the use of "cloud" services, Stream likely has found only a miniscule amount of the information taken. *See id.* ¶¶ 77, 79, 112. The mere showing, however, that one of the documents was a complete client list with detailed financial information is sufficient to demonstrate that Defendants sought to transfer trade secret information to their new employer. *See id.* ¶¶ 83–84. Accordingly, this Court should grant a preliminary injunction to protect Stream's trade secrets. *See Air Prods. & Chems.*, 442 A.2d at 1128 ("It is a logical conclusion from our courts reasoning in trade secret cases that the non-disclosure of trade secrets must be protected.").

(c) Breach of the Duty of Loyalty

Lorenz and Cresta breached their fiduciary duty of loyalty to Stream through their blatant and inappropriate misdeeds. "To prevail on a claim of breach of fiduciary duty of loyalty, a

13

plaintiff must demonstrate that his agent acted for a person or entity whose interests conflicted

with the plaintiff." *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 210 (Pa. Super. Ct. 2003)

(affirming jury verdict that found that defendant breached his fiduciary duty of loyalty to his

former employer); *see also* Restatement (Second) of Agency § 394 (1958). "There can be no

doubt that an agent owes a duty of loyalty to his principal, and in all matters affecting the subject

of his agency, he must act with the utmost good faith in the furtherance and advancement of the

interests of his principal." *SHV Coal, Inc. v. Continental Grain Co.*, 545 A.2d 917, 920 (Pa.

Super. Ct. 1988) (internal quotation marks and citation omitted), *rev'd on other grounds*, 587

A.2d 702 (Pa. 1991). In *SHV Coal, Inc.*, the Superior Court of Pennsylvania stated:

> Every agent "is subject to a duty not to act or to agree to act during
> the period of his agency for persons whose interests conflict with
> those of the principal in matters in which the agent is employed."
> Restatement (Second) of Agency § 394. He is "subject to a duty to
> his principal to act solely for the benefit of the principal in all
> matters connected with his agency." Restatement (Second) of
> Agency § 387. No man can serve two masters. *Onorato v.
> Wissahickon Park, Inc.*, 430 Pa. 416, 422, 244 A.2d 22, 25 (1968),
> citing Matthew 6:24.

*Id.* at 920–21; *see also Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1042 (N.J. Super. Ct.

Law Div.) ("Although an employee has the right to make preparations to go into a competing

business even while he is still employed, *he may not* breach the undivided duty of loyalty he

owes his employer while still employed, by soliciting his employer's customers or other acts of

secret competition." (emphasis added)).

　　　Here, Lorenz and Cresta certainly owed a duty of loyalty to Stream, and breached that

duty in conspiracy with Windward, who, upon information and belief, encouraged and continues

to endorse these transgressions. They breached this duty by taking Stream's proprietary

information and using it to set up a competing advertising business during their employment.

*See* Compl. ¶¶ 115, 124, 137–40.  Given that Windward acquired an existing and prospective

Stream client only days after Lorenz and Cresta left Stream, it is reasonable to conclude that

Lorenz and Cresta began using Stream's information regarding these clients to compete for their

accounts while still employed by Stream.  *See id.* ¶¶ 115, 124, 137–40.  Cresta's deployment of a

new portable electronic device the day before he resigned further evidences a breach of loyalty.

*See id.* ¶ 128.  Accordingly, his use of other portable drives as well as Lorenz's use of a hard

drive, other portable devices, and email transmissions to misappropriate Stream information

demonstrates that Lorenz's and Cresta's interests conflicted with Stream during their

employment in breach of their duty of loyalty.  *See id.* ¶¶ 77, 79, 112 128–29.

      (d) The Copyright Act

      "In general, copyright protection attaches at the time of the author's creation of an

original work susceptible to copyright under 17 U.S.C. § 102(a)."  *Cassway v. Chelsea Historic*

*Props. I*, Civ. A. No. 92-4124, 1993 WL 64633, at *2 (E.D. Pa. Mar. 4, 1993).  Thus, an author

need not comply with the procedural notice requirements to have his or her work protected.  *See*

*John Gianacopoulos, R.A. v. Glen Oak Country Club*, Civil Action No. 3:05-CV-2417, 2007 WL

405945, at *3 (M.D. Pa. Feb. 2, 2007) ("A copyright automatically exists the moment the work is

created: registration is a separate matter and is required before a copyright infringement action

can be brought in federal court.") (citations omitted)).

      "[N]o civil action for infringement of the copyright in any United States work shall be

instituted *until* preregistration or *registration of the copyright claim has been made* in accordance

with this title."  17 U.S.C. § 411(a) (emphasis added).  Stream therefore has a right to bring this

lawsuit, as it registered its copyrighted material on or about August 3, 2012.  *See* Compl. Ex. A.

Furthermore, the owner of a copyright holds "the exclusive rights to do and to authorize any of

the following: (1) to produce the copyrighted work in copies or phonorecords; (2) to prepare

derivative works based upon the copyrighted work; [and] (3) to distribute copies or phonorecords

of the copyrighted work to the public by sale or other transfer of ownership or by rental, lease, or

lending . . . ." 17 U.S.C. § 106. Anyone who violates these rights, like Lorenz and Cresta,

infringes a copyright. *Id.* § 501(a).

      Under the Copyright Act, Stream has exclusive rights to authorize derivative works as

"based on the copyrighted work." *Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F.

Supp. 1228, 1233 (D.N.J. 1992) (citations omitted). A "derivative work" is:

> a work based upon one or more preexisting works, such as a
> translation, musical arrangement, dramatization, fictionalization,
> motion picture version, sound recording, art reproduction,
> abridgment, condensation, or any other form in which a work may
> be recast, transformed, or adapted. A work consisting of editorial
> revisions, annotations, elaborations, or other modifications which,
> as a whole, represent an original work of authorship, is a
> "derivative work".

17 U.S.C. § 101. Courts have explained that "[a] derivative work is one that 'would be

considered an infringing work if the material which it has derived from a pre-existing work had

been taken without the consent of a copyright proprietor of such pre-existing work.'" *Value

Group, Inc.*, 800 F. Supp at 1233 (quoting *Peter Pan Fabrics v. Rosstex Fabrics*, 733 F. Supp.

174, 176 (S.D.N.Y. 1990)).

      "[T]he two elements necessary to state a claim for copyright infringement are: 1)

ownership of a valid copyright, and 2) copying of constituent elements of the work that are

original." *John Gianacopoulos, R.A.*, 2007 WL 405945, at *3 (citing *Feist Publications, Inc. v.

Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Dam Things from Denmark v. Russ Berrie & Co.

Inc.*, 290 F.3d 548, 561 (3d Cir. 2002)). In addition to direct evidence pertaining to the second

element, a plaintiff may present inferential proof. *Id.* "The requirements for inferential proof

are: 1) the defendant had access to the protected work; and 2) the two works are 'substantially similar.'" *Id.* (citing *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)). "Access is proven when a plaintiff shows the defendant had an opportunity to view or copy the plaintiff's work" while substantial similarity is proven by a comparison of the works. *Id.* (citations omitted).

When determining whether the works are substantially similar, this Court "should record [its] impressions as they would appear to a layperson viewing the [works] side by side . . . [and] concentrate upon the gross features rather than an examination of the minutiae." *Value Group, Inc.*, 800 F. Supp. at 1233 (quotation marks and citation omitted). "Substantial similarity does not require identity; sufficient similarity is found where the work is recognizable by the ordinary observer as having been taken from the copyrighted source." *Id.* (citation omitted).

In the mere sampling of information transmitted, Stream can show that Defendants improperly copied Cherry Hill Nissan ads, Nissan 24 ads, and Termac/Advantage Storage ads. *See* Compl. ¶¶ 121, 124. Stream has registered these ads with the Copyright Office and is the author/owner of the ads. *Id.* ¶¶ 121, 125; *see also* Compl. Ex. A.

### 2. Defendants' Misconduct Will Irreparably and Immediately Harm Stream if this Court Does Not Enjoin It.

To establish irreparable harm, Stream must demonstrate that money damages cannot remedy Defendants' misconduct. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). The Third Circuit has observed "that an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." *Id.* at 92–93. In *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244 (3d Cir. 1985), our court of appeals held that the plaintiff-employer satisfied the irreparable harm requirement by making "an ample showing that [its former employees] intended to use its trade secrets, and did

17

not intend to take reasonable measures to preserve their secret status." *Id.* at 1264. Moreover, this district court "has recognized on several occasions that the misuse of confidential information by a former employee constitutes immediate and irreparable harm under Pennsylvania law." *Air Prods. & Chems. v. Inter-Chem. Ltd.*, No. 03-CV-6140, 2003 WL 22917491, at *13 (E.D. Pa. Dec. 2, 2003) (citation omitted); *see also John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977) ("It is the possible consequences of this unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages.").

Here, like the defendants in *Heisley*, Lorenz and Cresta continue to use Stream's trade secrets to further the business interests of their start-up company, Windward. For example, upon information and belief, Defendants already have used Stream's trade secrets concerning Rafferty and Termac/Advantage Storage to acquire them as clients. *See* Compl. ¶¶ 115, 124, 137–38. The fact that Defendants have obtained these clients mere days after Lorenz and Cresta left Stream's employ demonstrates their intent to target more of Stream's clients in reliance on the information they misappropriated from Stream. *See id.* Accordingly, this Court should preliminarily enjoin Defendants from disseminating Stream's confidential, proprietary, and trade secret materials. *Accord Apple Computer, Inc.*, 714 F.2d at 1254 ("Thus even without the presumption of irreparable harm generally applied in copyright infringement cases, the jeopardy to Apple's investment and competitive position caused by Franklin's . . . copying of many of its key operating programs would satisfy the requirement of irreparable harm needed to support a preliminary injunction."); *Ecolaire Inc. v. Crissman*, 542 F. Supp. 196, 205 (E.D. Pa. 1982) ("There is no doubt but that ASH will suffer significant, irreparable injury to its business if

defendants are permitted to continue their program of unfair competition and use of ASH proprietary information.").

### 3. The Preliminary Injunction Will Not Harm Defendants.

The third factor, the balancing of the hardships, undoubtedly favors Stream. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004) (reversing the district court's denial of a preliminary injunction). Indeed, Defendants "'can hardly claim to be harmed [because they] brought any and all difficulties occasioned by the issuance of an injunction upon'" themselves. *Id.* (quoting *Opticians Ass'n of Am. v. Ind. Opticians of Am.*, 920 F.2d 187, 197 (3d. Cir. 1990) (directing issuance of preliminary injunction)).

Here, Stream is the only party to suffer any harm, as Defendants can continue to operate Windward without using Stream's protected and misappropriated proprietary information. As Defendants neither own nor have rights to the information secreted away, prohibiting them from using Stream information cannot harm them. *See* Compl. ¶¶ 83–110, 115–19, 121–22, 124–25. Moreover, the preliminary relief requested seeks to bar Defendants from servicing or soliciting to service a limited amount of advertising agency users in the Philadelphia region. *See* Pl. Stream Companies, Inc.'s Mot. for Prelim. Inj. ¶ 2. Stream is not seeking to prevent Windward, Lorenz, or Cresta from competing in the advertising agency marketplace. *See id.* ¶¶ 2–5. Stream is happy to compete against Windward to the extent that it can compete without Stream's information. Until Defendants can sufficiently demonstrate fair competition as to Stream's current and prospective clients, however, this Court should now allow them to compete as it is likely that such competition is unfair. Accordingly, money damages alone will not sufficiently compensate Stream, and the preliminary injunction will not harm Defendants.

19

### 4. **Granting Stream a Preliminary Injunction Is in the Public's Interest.**

Finally, granting Stream a preliminary injunction will favor the public interest, as Defendants continue to enter the competitive Philadelphia advertising market while using Stream's proprietary and confidential marketing information. Windward was founded on July 28, 2012—the day after Lorenz and Cresta's last day at Stream. Compl. ¶¶ 134, 136. On July 28th, Windward already had landed Rafferty Subaru as a client. *Id.* ¶¶ 137, 140. It appears that Windward also successfully solicited Advantage Storage less than twenty-four hours after their separation. *Id.* ¶¶ 138, 140. Stream's pricing information, media buying information, and return on investment information provides a significant competitive advantage to Windward in its solicitation of any client. *See Kos Pharms., Inc.*, 369 F.3d at 731–32 (discussing public interest factor and finding injunctive relief warranted). Further, where, as here, "the plaintiff has demonstrated a likelihood of success on the merits, . . . the public interest leans even more toward granting the injunction." *Air Prods. & Chem, Inc.*, 2003 WL 22917491, at *14. Accordingly, granting Stream a preliminary injunction in this case will serve the public interest.

## IV.  **CONCLUSION**

Accordingly, Stream respectfully requests that this Court grant its Motion for Preliminary Injunction Relief.

Respectfully submitted,


/s/ Frank R. Emmerich, Jr.
Frank R. Emmerich Jr., Esquire
Kyle M. Elliott, Esquire
Conrad O'Brien PC
1500 Market Street
Suite 3900, West Tower
Philadelphia, PA 19102-2100
femmerich@conradobrien.com
kelliott@conradobrien.com

Dated: August 10, 2012

21

## **CERTIFICATE OF SERVICE**

I, Frank R. Emmerich, Jr., hereby certify that on the date set forth below I caused a true and correct copy of Plaintiff Stream Companies, Inc.'s Motion for Preliminary Injunctive Relief, and Memorandum of Law in support thereof to be served via email to Mark T. Sophocles, Esquire, counsel for Defendants, mark.sophocles@verizon.net.


/s/ Frank R. Emmerich, Jr.
Frank R. Emmerich, Jr.

Dated: August 10, 2012