**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STREAM COMPANIES, INC.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 12-cv-4549** |
| | : | |
| **WINDWARD ADVERTISING and** | : | |
| **CORY LORENZ and MICHAEL CRESTA,** | : | |
| **Defendants.** | : | |

**REPORT AND RECOMMENDATION**

**LYNNE A. SITARSKI**                                        **DATE: February 7, 2013**
**UNITED STATES MAGISTRATE JUDGE**

Pending before this Court is Plaintiff Stream Companies, Inc., Motion for a Preliminary

Injunction against Defendants Windward Advertising, Cory Lorenz, and Michael Cresta.  (Doc.

No. 2).  The instant matter was referred to this Court by the Honorable C. Darnell Jones, II, by

Order dated October 23, 2012 to prepare a Report and Recommendation.  (Doc. No. 2).  For the

following reasons, this Court respectfully recommends that the motion be **GRANTED**.

I.        **PROCEDURAL HISTORY**

Plaintiff Stream Companies, Inc. ("Plaintiff" or "Stream") initiated this litigation on

August 10, 2012,  filing a Complaint against Defendants Windward Advertising ("Windward"),

Cory Lorenz ("Lorenz"), and Michael Cresta ("Cresta").  (Doc. No. 1).  In their Complaint,

Plaintiff alleges that Defendants engaged in improper conduct that violated the Computer Fraud

and Abuse Act (Count 2), the Copyright Act (Counts 4-6), the Pennsylvania Wiretap Act (Count

3), state trade secret law (Count 9), and the duty of loyalty (Count 7).  *Id.* at Counts 2-7, 9.  Also on August 10, 2012, Plaintiff filed a Motion for a Preliminary Injunction to enjoin Defendants from, *inter alia*, soliciting Stream clients and prospective Stream clients that were identified by Stream as of the date that Lorenz and Cresta were employed by Stream.  (Doc. No. 2).   On September 4, 2012, Defendants filed an Answer denying Plaintiff's claims, and asserting five Affirmative Defenses.  (Doc. No. 15).  Also on September 4, 2012, Defendant filed a Response in Opposition to Plaintiff's Motion for a Preliminary Injunction.  (Doc. No. 16).

On September 18, 2012, a hearing on Plaintiff's Motion for a Preliminary Injunction was begun before the Honorable C. Darnell Jones.  On October 23, 2012, Judge Jones referred the case to me for a continuation of the Preliminary Injunction hearing and for a Report and Recommendation on Plaintiff's Motion for Preliminary Injunction.  (Doc. No. 30).  Thereafter, I conducted further preliminary injunction hearings on October 25, 31, and December 5, 2012. The parties have submitted proposed findings of fact and conclusions of law.  (Doc. Nos. 49, 50).

## II.    FINDINGS OF FACT[1]

### A.    The Parties

1.  Plaintiff Stream Companies is a Pennsylvania Corporation with its principal place of business in Pennsylvania.  Compl., Pg. 1.  Stream was founded by David Regn and Jason Brennan in 1996, and today has over sixty-five employees.  N.T. 9/18/12 Brennan at 8.

---

[1]  The Findings of Fact are based upon the pleadings, the evidence and testimony offered at the hearing, and the full record.  The Findings of Fact include evidence garnered by testimony at the evidentiary hearings and reflects this Court's credibility determinations.  Fed. R. Civ. P. 52; *Bimbo Bakeries USA, Inc., v. Botticella*, 2010 U.S. Dist. LEXIS 68990 at *22-23, n.1 (E.D. Pa Feb. 9, 2010) (*citing Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855, 102 S. Ct. 2182, 72 L.Ed. 2d 606 (1982)).

2.  Stream is a full service advertising agency, providing creative services, production services, and media services  N.T. 9/18/12 Brennan at 9.

3.  Defendant Windward is a Pennsylvania Partnership consisting of four equal partners: Cresta, Lorenz, Gerry Summers and Joe Chambers.  Doc. No. 50 at 4.  Windward is also an advertising agency.

4.  Gravity Ad Network, Inc. is a Pennsylvania Corporation with its principal place of business in Pennsylvania.  Gravity sells online ad banners.  N.T. 10/25/12 Regn at 221.  Lorenz and Cresta are minority shareholders in Gravity; Lorenz is a 2% equity owner and Cresta is a 10% equity owner.  *Id.*  Gravity was created by Brennan and Regn, the co-owners of Stream.  In essence, Gravity functions as an entity that Stream utilizes to buy online banner ads on behalf of it's clients at a cheaper price.  *See Id.* at 223.

      **B.**      **Overview of the Parties Relationship**

5.  Defendants Cresta and Lorenz are former employees of Plaintiff Stream.  They both occupied senior-management level positions and were trusted "executives" during their employment at Stream.  N.T. 10/25/12 Cresta at 48-49; N.T. 10/31/12 Cresta at 170; *see also* N.T. 10/25/12 Regn at 234.

6.  Cresta was hired by Stream in August 2009.  N.T. 9/18/12 Brennan at 19.  Cresta's initial position at Stream was Vice President of Media.  *Id.*  Cresta was responsible for growing the media department, reviewing all media buys, as well as vendor and media relations.  *Id.*

7.  In 2011, Cresta became Stream's Vice President of strategic partnerships.  N.T. 9/18/12 Brennan at 19.  In this position, Cresta's main responsibility was to utilize the business relationships he had developed in order to find clients with larger advertising and media budgets. *Id.*  Cresta no longer had responsibility for things such as reviewing the prices that media outlets charged Stream for media space, nor was he responsible for maintaining relationships with current media partners.  *Id.*

8.  Cresta was unsuccessful in his role as Vice President of strategic partnerships.  N.T. 9/18/12 Brennan at 20.  As a result, his role changed to the sale of online display advertising.  *Id.* Online display advertising is the generic term for "banner ads."  An online banner ad is one which appears on the top or side of a web page.  *Id.*

9.  Lorenz was hired on February 2, 2010.  N.T. 10/25/12 Lorenz at 142.  Lorenz's initial position at Stream was that of media buyer.  *Id.* at 142-143.  Lorenz was responsible for, *inter alia*, negotiating the purchase of air time on television to place advertisements.  *Id.*

10. In 2011, Lorenz was promoted to Media Director.  N.T. 10/25/12 Lorenz at 142.  In this position, Lorenz oversaw the media department.  *Id.*  He was responsible for the strategic

direction of the media buys for clients, including identifying what was available, and what media buy makes the most sense for the individual client.  N.T. 9/18/12 Brennan at 23-24.  He was also involved in hiring and training the staff of media buyers.  N.T. 10/25/12 Lorenz at 143.

11.  Stream's confidential and proprietary information is kept on its computer network, on the "W:Drive."

12.  The W:Drive is accessible only by Stream employees, who can only gain access to the drive with a unique username and password.  N.T. 10/25/12 Lorenz at 160.  The W:drive is accessible at computers physically located at Stream.  In addition, the W:Drive can be accessed from outside of Stream's headquarters only if an employee is granted "VPN access."  N.T. 9/18/12 Brennan at 12.

13.  Cresta and Lorenz had on-site access to the W:Drive as employees of Stream.  Cresta did not have VPN access, but Lorenz did.  N.T. 10/25/12 Cresta at 16.

14.  Gravity Corporation also keeps some of its information on the Stream W:Drive.  By virtue of being an employee at Stream, an individual could access Gravity's information on the W:Drive. Gravity does not have employees.  N.T. Regn 10/25/12.  Gravity's only function is to sell online ad banners when a Stream client needs them.  *Id.*  Thus, Stream is a vendor to Gravity in that it obtains business for Gravity.  N.T. 10/25/12 Regn at 223.  In fact, Gravity gets all of its business via Stream and its clients.  In return for the business Stream generates for Gravity, Gravity pays Stream $12,000 per month.[2]  *Id.*

15.  Although both Stream and Gravity have information on the W:Drive, one does not have access to Stream's confidential information unless they are an employee of Stream.  Cresta and Lorenz's access to Stream's confidential information only existed by virtue of their status as employees of Stream.  N.T. 10/25/12 Cresta at 53.

16.  Defendants Cresta and Lorenz do not have access to the W:Drive as non-employee, minority owners of Gravity Corporation.  N.T. 9/18/12 Brennan at 12.

17.  Neither Cresta nor Lorenz signed a non-compete agreement, a non-disclosure agreement, or a restrictive covenant with Stream.  N.T. 10/25/12 Regn at 215.  The culture among the Stream workforce was that employees would only access the files needed for their jobs.  *Id.* at 216; N.T. 10/31/12 Barilla at 103.

---

[2]  When compared to all of the services Stream offered their clients, banner ad sales account for a very small portion of the Stream revenue.  For example, Exhibit 16 sets forth what one particular Stream client, Burlington, spent on advertising services with Stream.  Pl. Ex. 16. Similar to other Stream clients, Burlington is a company that owns multiple car dealerships. N.T. 10/25/12 Cresta at 63.  Burlington spent just over 1% of their advertising budget on the purchase of online banner ads.  *Id.*; *see also* Pl. Ex. 16.

### C.    Events leading to the end of Cresta and Lorenz's employment at Stream.

18.  In February, 2012, Cresta and Lorenz began planning to start their own advertising agency.[3] N.T. 10/25/2012 Cresta at 20-1, 75.  Cresta and Lorenz did not inform Stream of these plans or intentions.  In fact, they took precautions to keep Stream from finding out, such as using their non-Stream e-mail accounts when discussing the new ad agency.  *See* N.T. 10/25/12 Cresta at 93.

19.  Cresta and Lorenz's testimony that they remained loyal employees of Stream in May 2012 and gave "one hundred percent" of their efforts to Stream is not credible, and is belied by the record.  For example, on May 24, 2012, Stream lost a bid to become the ad agency for prospective client UAB.  N.T. 10/25/12 Cresta at 82.  Cresta and Lorenz celebrated the fact that Stream was unsuccessful in landing UAB as a new client.[4]  Pl. Ex. 30 at 521.

20.  On or about May 25, 2012, Defendants Cresta and Lorenz put together a business plan to form Windward. Pl. Ex. 8.  Stream was still unaware that Cresta and Lorenz were planning to compete with Stream.

21.  Also in May, Cresta began discussions with the O'Reilly's about advertising opportunities for them outside of Stream.  N.T. 10/25/12 Cresta at 43.  N.T. 10/25/12 Cresta at 89.  The O'Reilly's are two brothers who own a number of businesses that were current clients of Stream, such as Tarmac and Advantage Storage.  *Id.* at 43.  These discussions damaged Stream's relationship with the O'Reilly's.

22.  Cresta began soliciting Stream's current clients for Windward.  He did not think it was wrong to solicit Stream clients to come to Windward, despite the fact that he was still employed by Stream.  N.T. 10/25/12 Cresta at 94-95.

23.  On June 5, 2012, Cresta sent out text messages informing others that he had "converted" two Stream clients, which together generated six thousand dollars of business per month.  N.T. 10/25/12 Cresta at 86.

24.  Cresta continued soliciting the O'Reilly's businesses (i.e. Tarmac) throughout June.  On June 14, Cresta exchanged text messages with Mr. Olenski, a potential partner in Windward.  Cresta informed Mr. Olenski that he was "firing up the Tarmac guys" to leave Stream and become clients of Windward.  N.T. 10/25/12 Cresta at 74, 88.

---

[3]  Initially, the new ad agency was to be called the "Gillespie Group."  N.T. 10/25/12 Cresta at 86.  The name would later be changed to Windward Advertising Agency.

[4]  A text message exchange between the two on May 24, 2012 clearly shows they intended to compete with Stream, and no longer wished to see Stream succeed.  Pl. Ex. 30 at 389, 521.  Discussing Stream, Lorenz sent a text message to Cresta stating "F*** them," to which Cresta responded "Don't worry. We're going to."  *Id.*

25.  At that time, Cresta thought he had convinced Tarmac to leave Stream and become a client of Windward.  N.T. 10/25/12 Cresta at 90.  Tarmac and the other O'Reilly businesses are no longer Stream clients.  *Id.* at 43.  Windward continues to meet with them, although they have not formally become Windward clients.  *Id.* at 44.

26.  On June 25, 2012, Cresta met with another partner in Windward, Joe Chambers, during the business hours of Stream.  N.T. 10/25/12 Cresta at 92.  Stream was not aware that this meeting concerned the formation of a new, competing advertising agency.

27.  On June 28, 2012, Cresta and Lorenz exchanged an e-mail containing a re-formulated version of the Windward business plan.  Pl. Ex. 9.  The business plan identified Stream as one of Windward's top competitors, and also identified Tarmac – who was then a Stream client – as being on board as a Windward client.  N.T. 10/25/12 Cresta at 89, Pl. Ex. 30 ¶ 6.2.

28.  On July 3, 2012, Cresta received a text message from a Stream vendor informing him that Rafferty Subaru was looking for a new advertising agency.[5]  N.T. 10/25/12 Cresta at 102.  The vendor was unaware that Cresta was leaving to start a new advertising agency, and was giving the lead to Cresta in his capacity as a Stream employee.  *Id.*  Ordinarily, when a Stream employee was presented with a "lead," they would pass that information along to the appropriate people at Stream.  N.T. 10/25/2012 Regn at 215.  Cresta did not pass this information along to Stream.  N.T. 10/25/12 Cresta at 101.

29.  On July 8, 2012, Lorenz inserted a thumb drive in his Stream computer and downloaded several documents.  Also on that same day, Cresta and Lorenz exchanged e-mails containing Windward's Business plan and budget. Pl. Ex. 8.

30.  On July 9, 2012, Cresta and Lorenz exchanged an e-mail containing another Windward business plan.  N.T. 10/25/12 Cresta at 90.  Lorenz was primarily responsible for writing the business plans, although some duties were shared.[6]  *Id*. At 90-91; Pl. Ex. 10.

31.  On July 10, 2012, Lorenz arrived early for a meeting with a Stream client, Jason Williams, in order to gauge their interest in leaving Stream and doing business with Windward.  *See* N.T. 10/25/12 Cresta at 96-97.  Cresta and Lorenz's testimony that Lorenz was arriving early to pursue opportunities for Stream is not credible.  *See Id.*  In a text message exchange between Cresta, Lorenz and another Windward Partner, Joe Chambers, Lorenz stated that he was "temp taking Jason Williams."  *Id.*; Pl. Ex. 30.  This evinces that he was pursuing opportunities for Windward.

---

[5]  As noted in the discussion of Gravity and Stream's relationship, a vendor is one who supplies an advertising agency with business.

[6]  Plaintiffs' Exhibits 8, 9, and 10 are the three business plans created by Cresta and Lorenz.

32. On July 11, 2012, representatives from Rafferty Subaru came to visit Stream for a meeting concerning Rafferty Subaru's advertising account. N.T. 10/25/12 Cresta at 100. That same day, Cresta was called into a meeting with Regn and Brennan, and Cresta was asked to perform research for Stream's pitch to Rafferty. *Id*. at 100-101. Specifically, he was asked to familiarize himself with the Rafferty Subaru account and research the media buying rates for the account.[7] *Id.* Cresta accepted this duty without informing anyone at Stream that he was planning to compete with them for this same client. *Id.* at 106-107. Cresta then passed some of the information learned from this assignment along to colleagues in the new agency. *Id* at 106, 109. After passing the information along, Windward reached out to the owner of Rafferty Subaru and set up a meeting. *Id.*

33. On July 12, 2012, Cresta resigned from Stream at 10:00 a.m.[8] N.T. 10/25/12 Cresta at 110. Cresta concealed the fact that he was leaving to start a new, competing advertising agency. Instead, Cresta told Stream he was leaving to make "skateboard movies." *Id.* at 111. Cresta's testimony that he did not try to conceal from Stream the fact he would be leaving to start a new agency is not credible. It is clear that his true motivation for leaving Stream was to focus his efforts on Windward and compete with Stream for the Rafferty Subaru account.

34. Cresta left the Stream building for the final time on July 12, 2012. N.T. 10/25/12 Cresta at 111. However, prior to leaving Stream's premises, he inserted a thumb drive on his Stream computer at 11:58 A.M. N.T. 10/31/12 Cinquanto at 22. He downloaded between 80-100 documents comprising Stream's confidential information. *Id.*; *see also* Pl. Ex. 15-18. Cresta's testimony that he downloaded these documents to further the interests of Stream is not credible. He had just resigned from Stream and there was no reason for him to access these documents after his resignation. Cresta's reliance on his minority ownership in Gravity as justification for downloading these documents is also not credible.

35. On this same date, July 12, 2012, Windward was preparing their own pitch to Rafferty Subaru. Cresta, Lorenz and Joe Chambers all contributed on the Rafferty Subaru pitch. N.T. 10/25/12 Cresta at 112.

36. On July 13, 2012 Cresta bought a new computer for Windward. N.T. 10/25/12 Cresta at 70.

---

[7] As noted previously, media buying rates are the price that an advertising agency will pay to secure air time for its client's advertisements. The rates that an advertising agency and its client pays for media spots are the result of negotiations with media outlets and are confidential information.

[8] Cresta's resignation letter, dated July 13, 2012, stated that his resignation would be effective on July 27. Pl. Ex. 12. However, his final day working at Stream was July 12. N.T. 10/25/12 Cresta at 111. He received his last pay check from Stream on July 30. N.T. 9/18/12 Brennan at 22.

37.  On July 15, 2012 –  knowing he would resign in the near future to focus on Windward – Lorenz inserted a portable hard drive onto his Stream computer, and downloaded a substantial volume of documents.[9]  N.T. 10/25/12 Lorenz at 172.  Many of these documents contained Stream's confidential information.

38.  Lorenz also took Stream documents to use as templates for Windward.  Lorenz's testimony that he created all the documents Windward used, and did not use any Stream documents, is not credible.  For example, on July 16, 2012, Lorenz forwarded himself a Stream document that contained a survey Stream gives to clients in order to tailor a particular service to that client's business model. N.T. 10/25/12 Lorenz at 191; Pl. Ex. 36.  Forensic analysis of Lorenz's Windward computer found this same document saved in a Windward file folder.  *Id.* at191-192.

39.  On July 17, 2012, Cresta, along with others, met with Rafferty on behalf of Windward.  N.T. 10/25/12 Cresta at 46-47.  At the meeting, Cresta used a presentation booklet called a "deck" that had been prepared by both Cresta and Lorenz.  Pl. Ex. 23.  Lorenz was still employed by Stream at this time.

40.  On July 19, 2012, Lorenz resigned from Stream Companies, informing them that his last day would be July 27, 2012.  N.T. 10/25/12 Lorenz at 152.  Like Cresta, Lorenz concealed the fact that he was going to be joining Cresta to form a competing advertising agency; rather, Lorenz told Stream he was considering offers from two established agencies.  *Id.* at 153.  Although Lorenz had resigned from Stream, he continued to work there until July 27, 2012, while also working for Windward in direct competition with Stream.  That same day, Brennan asked Lorenz if there was "anything [Lorenz] wanted to tell them ethically."  Pl. Ex. 30.  Lorenz did not admit to misappropriating Stream's information, and assured Cresta that he "stuck to his story" of leaving to consider offers from two advertising agencies.  *Id.*

41.  On July 20, 2012, Lorenz received a lead on his Stream e-mail identifying Horsepower Harley Davidson as a potential client for Stream.  N.T. 10/25/12 Lorenz at 193; Pl. Ex. 30.  The lead came from the manager of one of 13 "Comcast Spotlight" offices.  N.T. 10/25/12 Cresta at 129.  Stream did business with Comcast Spotlight, and Lorenz received the e-mail because of Stream's relationship with Comcast Spotlight.  *Id.*  Lorenz did not pass along the lead to Stream; rather, he informed Cresta about it, and told him he would have the lead e-mailed to both Lorenz and Cresta at their private e-mail accounts.  *Id.*

42.  On July 24, 2012, Lorenz passed along information learned from a Stream employee, "Karl," regarding Rafferty Subaru's preferences.  N.T. 10/25/12 Lorenz at 179.  This information was used by Windward in their solicitation of Rafferty.  Cresta and Lorenz's testimony denying that they used this information is not credible.  *See* Pl. Ex. 30, N.T. 10/25/12 Lorenz at 179.

---

[9]  As discussed further below, a portable hard drive and a thumb drive are two types of "external storage devices."  These can be used to copy documents from one computer for use at a later time on a computer at a separate location.

43.  On July 25, 2012, Windward had a follow-up meeting with Rafferty which was attended by Cresta, Lorenz, Joe Chambers and McCrossen.  N.T. 10/25/12 Lorenz at 178.  They again used a deck containing information taken from Stream and Stream's employees.  *Id.* at 179.  Their testimony that they did not use this information is not credible.  Cresta admitted that having the Stream budgets for other Subaru car dealerships, such as McCafferty Subaru, would be helpful in formulating the budget they presented to Rafferty Subaru at the July 25, 2012 meeting.  N.T. 10/31/12 Cresta at 201-203.

44.  July 27, 2012 was Lorenz's last day working as a Stream employee.  N.T. 10/25/12 Lorenz at 152.

45.  On July 28, 2012, Stream learned that Cresta and Lorenz had created Windward and signed Rafferty Subaru as a client.  N.T. 9/18/12 Brennan at 17-18; N.T. 10/25/12 Regn at 204.  Stream immediately retained counsel and discovered that documents were sent from corporate e-mail accounts to personal e-mail accounts by Lorenz and Cresta.  N.T. 9/18/12 Brennan at 27.

### D.   Summary of Confidential Documents and Information Defendants had access to and took from Stream.

46.  Louis Cinquanto ("Cinquanto"), an expert in computer forensics, testified as an expert witness on behalf of Plaintiff at the preliminary injunction hearing.  N.T. 10/31/2012 Cinquanto at 10.  Cinquanto was a credible witness.  Defendants did not call a computer forensic expert to testify on their behalf at the preliminary injunction hearing.

47.  Cinquanto examined the computers that Cresta and Lorenz used while employed at Stream Companies.  He testified that during the period of May-July, both Cresta and Lorenz used external thumb drives and external hard drives numerous times.  Both of these devices can be used to transfer documents from one computer to another.[10]  Cinquanto further testified that his examination showed that Cresta and Lorenz had rarely used thumb drives and hard drives prior to this May through July time frame, but then began using them quite often.  N.T. 10/31/12 Cinquanto at 14, 47.

48.  Cinquanto's examination of Cresta's computer found that he used four new portable drives from the period of April-July.  N.T. 10/31/12 Cinquanto at 14-15.  None of these thumb drives have been produced by Defendants for examination, and Defendants assert that they have lost all of them.  In addition, Cinquanto's examination found that Cresta had used an external hard drive on his Stream computer.  *Id.* at 14.  A separate examination of Cresta's Windward computer found that he plugged that same hard drive into his Windward Computer.  *Id.* at 14.

---

[10]  External thumb drives and hard drives are both types of portable storage devices.  The difference between the two is that an external hard drive has a larger storage capacity than does a thumb drive.  N.T. 10/31/12 Cinquanto at 26.

49.  Cresta used one thumb drive to transfer documents off of his Stream computer at 11:58 A.M. on July 12, 2012.  N.T. 10/31/12 Cinquanto at 18.  This was over an hour after he had resigned from Stream, but prior to his exit from the building.  This thumb drive has not been accounted for; but Cinquanto was able to identify some of the documents that Cresta accessed and copied onto the thumb drive through examination of Cresta's Stream Computer.  *Id* at 18.  Cresta also admitted that he accessed Stream documents after he had resigned from Stream.  N.T. 10/25/12 Cresta at 22.

50.  Cresta admits that Exhibits 16-18 were Stream documents he accessed on his last day.  N.T. 10/25/12 Cresta at 22.  Cinquanto's examination of Cresta's Stream computer confirmed that these documents were transferred onto a thumb drive that same day.  N.T. 10/31/12 Cinquanto at 20-21.  Exhibits 16-18 include Stream's confidential information such as financial spreadsheets, budgets, and digital proposals.  N.T. 10/31/12 Cinquanto at 20-21.  Cinquanto's examination of Cresta's Windward computer showed that Cresta inserted the same thumb drive he used on his Stream computer on July 12 into his Windward computer on July 16, 2012.

51.  One of these documents, Exhibit 16, includes a budget for an actual Stream client.  N.T. 9/18/2012 Brennan at 36.  This document contains Stream's confidential pricing and pricing strategy for this client.  *Id.*  This document is valuable to a competing advertising agency and, conversely, harmful to Stream in a competitors hands.  *Id.*  It would give a competitor insight into how Stream manages its costs for a particular client.  *Id.*  It also allows a competitor to undermine Stream's pricing strategy by outbidding them in areas it knew were important to Stream and its client.  *Id.* at 37.  Finally, a competitor could use this information to sour relationships with particular clients by leaking the clients sensitive spending information to the market or approaching the client with perceived deficiencies in what Stream was charging.  *Id.*

52.  Another of these documents, Exhibit 17, is an estimate for a large project for another Stream client, Campbell Fittings.  N.T. 9/18/2012 Brennan at 34.  This document contains confidential line item information, showing exactly how Stream arrived at its pricing for this client.  *Id.*  This document is confidential, in part because the price and service strategy Stream employs is different for each client.  *Id.*  This document would be valuable to Stream and a competitor could use it to see where and how Stream makes a profit for a particular client.  Additionally, a competitor could use this as a reference point for determining the work product that needs to be put together for clients similar to Campbell Fittings.  *Id.* at 36.

53.  Another document downloaded by Cresta, Exhibit 18, is a billing spreadsheet for all of Stream's clients.  This document is highly confidential and contains information about Stream revenue, discloses Stream's client list, revenue for each client, and reveals Stream's client marketing strategies.  N.T. 10/25/2012 Cresta at 36-37.  Cresta admitted that this document is not something that Stream would want in the hands of the competition.  *Id.*

54.  Exhibit 18 is very valuable to Stream and would greatly harm Stream if known by competitors.  This document essentially shows a competitor all of Stream's pricing strategies for

every client and their overall business operation.  A competitor could use this document to see Stream's overall business strategy and to identify strategies that Stream used for individual clients.  N.T. 9/18/2012 Brennan at 33.

55.   Cinquanto also testified that Cresta had accessed between 80-100 files in a very short period of time on his last day as a Stream employee.  N.T. 10/31/12 Cinquanto at 22.  Some of these documents were confidential, such as prospective client surveys and website quotes.  Cresta also accessed the templates that Stream used for many of their client checklists and surveys.  *Id.*  All of these documents were accessed in a very short period of time, which is indicative of being copied onto a thumb drive, and not individually opened and read.  *Id.* at 19.

56.   Cresta testified that he accessed all these documents because he was trying to be a better "student of the game" and further Stream's interests.  N.T. 10/25/12 Cresta at 32-33, 49-50.  This testimony is not credible.  Cresta accessed these documents after he had resigned, and prior to leaving the Stream facility for the final time.  Given the speed in which he accessed 80-100 documents, the more plausible explanation is that Cresta accessed these documents to copy them and take them with him for future use in competing with Stream.

57.   Cresta used his minority ownership in Gravity as an excuse for downloading many documents, including Exhibit 18.  N.T. 10/25/12 Cresta at 34-35.  This testimony is not credible; Cresta was not majority shareholder, executive, or employee of Gravity when he accessed this document.  There was no reason for him to access this document after he resigned from Stream. A review of Defendants' responses to depositions and interrogatories shows that they did not mention Gravity as a reason for accessing documents until just prior to the first preliminary injunction hearing.  Cresta's inconsistent justifications for downloading this document further undercuts his credibility.

58.   Cinquanto's examination of Lorenz's Stream Computer found that thumb drives were inserted on July 4 and 8, 2012.  On July 15, 2012 Lorenz inserted an external hard drive into his Stream computer.  N.T. 10/31/12 Cinquanto at 26.

59.   On July 15, 2012, the date that Lorenz inserted the external hard drive into his Stream computer, Lorenz accessed about a hundred files.  N.T. 10/31/12 Cinquanto at 29.  Examples of the types of documents and things put on the hard drive included radio scripts, dealer market shares, spreadsheets, and MP3 files containing radio commercials.  *Id.* at 28-29.

60.   Exhibit 40 is one document that Lorenz put on his hard drive and contains a spreadsheet for Stream client, Jack Williams Car.  Pl. Ex. 40; *see also* N.T. 10/31/2012 Cinquanto at 12.  Lorenz also took budgetary information, such as return-on-investment data, for Jack Williams Car.  *Id* at 50.

61.   This information is valuable to Stream's competitors because the competitor could change the Stream strategy and media mix that Stream carries out, in an effort to improve upon it.  N.T.

11

10/25/2012 Regn at 213; Pl. Ex. 33.

62. Cinquanto also examined Cresta and Lorenz's personal computers. Cinquanto testified that he found an e-mail from Mr. Olenski instructing Lorenz to grab some radio scripts before he left Stream. This e-mail confirms that Lorenz put the radio scripts on the external hard drive to take them for Windward's use. Lorenz provided inconsistent testimony on this topic. At his deposition, Lorenz testified that he was never asked for Stream information. N.T. 10/25/12 Lorenz at 179. At the preliminary injunction hearing, Lorenz testified that Olenski did ask him for scripts, but he refused to provide them. *Id*. at 179-180. Partly because of this inconsistency, Lorenz's testimony on this topic is not credible.

63. Cinquanto testified that, in general, the information that Lorenz and Cresta had taken included Stream financial information, pricing models, ads, scripts, sound bites for commercials, and Stream pricing information, showing what they charged and how they made a profit. N.T. 10/31/12 Cinquanto at 52-53. Cinquanto testified that it appeared to him that Cresta and Lorenz had taken the information constituting Stream's "play book." *Id.* at 53.

64. Cinquanto testified that he was unable to identify the universe of information taken or where and how it was all used because many of the devices Cresta and Lorenz used to download documents were not produced. N.T. 10/31/12 Cinquanto at 51.

        **E.**     **Defendants' Production of Electronically Stored Information.**[11]

65. On July 30, 2012 Cresta and Lorenz received a "Cease and Desist" letter from Stream. Pl. Ex. 20.

66. On August 13, 2012, Judge C. Darnell Jones II issued an Order, directing that Defendants preserve evidence, including e-mail exchanges, phone exchanges, computer hard-drives and social media electronic information. Doc. No. 5. Additionally, Defendants were ordered to terminate the auto-delete functions on their e-mail accounts, cell phones, and computer hard drives, and to obtain electronic forensic imaging of various electronic devices in their possession. *Id.*

67. Cinquanto testified that after the August 13, 2012 Order, both Cresta and Lorenz took active steps to delete relevant e-mails. N.T. 10/31/12 Cinquanto at 45. Cinquanto noted that in order to delete e-mails, one had to take two active steps; first deleting the e-mail generally and then going into the trash bin and deleting those e-mails from the trash bin. *Id.* Once e-mails are deleted from the trash bin, they will be overwritten by the computer. *Id.* If e-mails are only partially overwritten, forensic imaging will be able to recover evidence limited to the e-mail subject line,

---

[11] Plaintiff Stream Companies has suggested that it intends to seek an award of sanctions arising out of Defendants' conduct in this case, including monetary sanctions and/or remedies available if it is determined that Defendants engaged in spoliation of evidence.

and the body of the e-mail will not be recoverable.  *Id* at 46.  Cinquanto testified that he was able to recover several e-mails with subject lines of Stream or Windward.  *Id.*

68.  Exhibits 41 and 42 are representative of e-mails deleted by Cresta.  Exhibit 41 contains e-mails Cresta deleted after the Court's August 13, 2012 Order.  These e-mails contain subject lines such as Rafferty Deck, Rafferty PPT, Stream, Additional Scripts, Stream Companies, Inc. v. Windward Advertising, et al., "what's the word," Stream v. Windward, Change of Current Copy-Rafferty Subaru, Rafferty Inquirer-Sept, and Rafferty Subaru Adwords PPC.  Pl Ex. 41.  These e-mails are dated between August 15, 2012 and August 30, 2012.  Cinquanto couldn't be sure if he recovered all of the e-mails, and could not read the body of many e-mails because they had already been overwritten by the time he did his imaging.  N.T. 10/31/12 Cinquanto at 46.  Nevertheless, it is clear Cresta took active steps to delete e-mails, in contravention of the Court's August 13, 2012 Order.  Cresta's testimony that he did it by accident, or that family members deleted the e-mails, is not credible, particularly because e-mail deletion is a two-step procedure, as Cinquanto explained.  Cinquanto further testified that, based upon his examination of the internet history and the types of files on Cresta's Windward computer, he did not find evidence that it was being used by Cresta's family.  N.T. 10/31/12 Cinquanto at 47-49.

69.  On August 21, 2012, Defendants were ordered to produce documents by August 27, 2012, after Stream filed a Motion to Compel.  Doc. No. 7.

70.  In examining Cresta's computer, Cinquanto reviewed Cresta's internet history from August 13, 2012 through August 30, 2012.  N.T. 10/31/12 Cinquanto at 54.  Cinquanto found that Cresta had actively researched how to delete a hard drive or delete information from a hard drive.  *Id.*

71.  Defendants have also failed to produce a large number of devices.  As noted previously, Defendants have not produced any of the six thumb drives onto which they had downloaded Stream documents.  Defendants also have failed to produce the computers that they used prior to July 13, which is the date they claim to have bought new computers for their use at Windward. Defendants testified that their pre-July 13, 2012 computers crashed, and they both disposed of them through the trash.  N.T. 10/25/12 Cresta at 72.

72.  Lorenz also failed to produce his iPhone and iPad for imaging.  Lorenz admitted he used his iPad to open e-mails containing Stream documents that he sent to his private account from his Stream account.  Lorenz admits he never produced his iPhone or iPad for imaging.  N.T. 10/25/12 Lorenz at 195.  Lorenz testified that these were not produced pursuant to the August 13, 2012 Order because "this is my first litigation."  *Id.*

73.  Cresta failed to produce the hard drive he connected to his Stream computer.  Cresta denied ever using a hard drive.  N.T. 10/25/12 Cresta at 26.  This testimony is not credible, as it is belied by other credible evidence of record.  Forensic evidence showed that Cresta had hooked up the same Western Digital 500 hard drive to both his Stream and Windward computers.  N.T. 10/31/12 Cinquanto at 34-35.

13

III.     **CONCLUSIONS OF LAW**

The primary purpose of a preliminary injunction is the maintenance of the status quo until a decision on the merits of a case is rendered.  *Kos Pharmaceuticals, Inc. v. Andrx Corporation*, 369 F.3d 700, 708 (3d Cir.2004).  "Status quo" is defined as the last, peaceable, noncontested status of the parties.  *Id.*  To prevail on a motion for preliminary injunctive relief, the moving party must demonstrate that each of the following factors favors the requested relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.  *Rogers v. Corbett,* 468 F.3d 188, 192 (3d Cir. 2006) (*quoting Kos Pharmaceuticals*, 369 F.3d at 708); *McNeil Nutritionals, LLC v. Heartland Sweeteners*, 511 F.3d 350, 356-357 (3d Cir. 2007)(*quoting Shire U.S. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).  Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." *Kos Pharmaceuticals*, 369 F.3d at 708 (*quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)); *Nutrasweet Company v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir.1999).

The burden lies with the moving party to establish every element in its favor. *P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC.*, 428 F.3d 504, 508 (3d Cir.2005).  An injunction cannot issue if either of the fundamental requirements - likelihood of success on the merits and probability of irreparable harm if relief is not granted - are absent. *McKeesport Hospital v. Accreditation Council for Graduate Medical Education*, 24 F.3d 519, 523 (3d Cir.1994).

Plaintiff seeks to preliminarily enjoin Defendants from using their confidential and proprietary information, and from soliciting any entity or person other than Rafferty Subaru, Center for Resolutions, Warwick Jewelers, Armen Cadillac, Jeff D'Ambrosio, and the O'Reillys' businesses.

For the reasons that follow, I find that Stream is entitled to preliminary injunctive relief on the basis of two claims: (1) misappropriation of trade secrets and (2) breach of the duty of loyalty.[12]  For each claim, I address the four preliminary injunction elements in turn.

### A.    Trade Secret Misappropriation

### a.    Likelihood of Success on the Merits.

Under Pennsylvania law, a claim for trade secret misappropriation requires that the following elements be established:

> (1) the existence of a trade secret;
> (2) communication of the trade secret pursuant to a confidential relationship;
> (3) use of the trade secret in violation of that confidence; and
> (4) harm to the Plaintiff.

*Latuszewski v. VALIC Fin. Advisors, Inc.,* 393 Fed. Appx. 962, 965 (3d Cir. 2010) (*citing Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003); *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 419 Pa 248, 213 A.2d 769, 775 (Pa. 1965)).

The determination of whether something constitutes a trade secret is governed by the

---

[12]   Stream's Proposed Findings of Fact and Conclusions of Law sets forth argument pertaining to their claim under the Computer Fraud and Abuse Act ("CFAA").  However, aside from arguing they have demonstrated a likelihood of success, they have not set forth any argument indicating harm beyond monetary damages.  This Court is unable to determine how any CFAA violation irreparably harmed Stream.  To the extent that Stream's harm from an alleged CFAA violation results from a loss of their confidential information, such harm is addressed in the discussion of the claims of trade secret misappropriation and breach of the duty of loyalty.

Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. Ann. § 5301 *et seq.*

PUTSA defines a trade secret as:

> Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:
>
>> (1) Derives independent economic value, actual or potential, from not being generally known to, ant not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5302.  Under Pennsylvania law, the following factors are often considered in determining whether information qualifies as a trade secret:  (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1275 (Pa. Super. Ct. 1997) (*quoting Tyson Metal Prods., Inc. V. McCann*, 376 Pa. Super. 461, 546 A.2d 119, 121 n.1 (Pa Super. Ct. 1988).

  Many of the confidential documents that Cresta and Lorenz took from Stream constitute trade secrets under PUTSA.  As noted in the Findings of Fact, it is beyond dispute that Cresta and/or Lorenz downloaded the following documents from Stream's W:Drive:

> 1. A spreadsheet for individual clients, including pricing and pricing strategy for that client.  (Ex. 16).
>
> 2.  An estimate for Stream client, Campbell Fittings, showing line item

information and profit margins.  (Ex. 17).  This document contained line item data for each service Stream offered Campbell Fittings and their strategy for that client.

3. Stream's Billing Spreadsheet (Ex. 18).  This document essentially shows Stream's overall business strategy, pricing information broken down by category of services offered by Stream, Stream's marketing strategies for each client and profit margin for each client.  Cresta at 36.

4. Stream's prospective client list, showing the identifies of customers targeted for upcoming bids.

5.  A spreadsheet and budgetary information, such as return-on-investment data for Stream client Jack Williams Car. Ex. 33, 40.

As stated in the Findings of Fact, the information Defendants took with them was developed by Stream over sixteen years, through the expenditure of significant resources.  These information contained in these documents allow Stream to compete effectively in the advertising marketplace.  Conversely, these documents are very valuable to Stream's competitors, and thus have the potential to hurt Stream competitively.  Many of these documents contain Stream's confidential, customer-specific pricing and marketing strategies.  The Third Circuit has previously found this type of information to be trade secret protected.  *See Latuszewski v. VALIC Fin. Advisors, Inc.,* 393 Fed. Appx. 965 (3d Cir. 2010) (finding that pricing information such as investment preferences and financial objectives are protected by trade secret).

Additionally, many of these documents contain information about Stream's profit margins: they reveal what Stream charges for services, their in-house costs for those services, and where they make profits for each service.  This type of information allows a competitor to "save valuable resources in not having to develop the same information and techniques and would allow it to introduce new processes or cost-saving measures significantly sooner that it would

otherwise be able to do." *Bimbo Bakeries USA, Inc. v. Botticella*, CIV-A 10-0194, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *10 (E.D. Pa., Feb. 9, 2010) *aff'd*, 613 F.3d 102 (3d Cir. 2010).

The Stream billing spreadsheet (Exhibit 18) captures - in one document - some of the most commercially valuable and sensitive information of Stream Companies.  Stream's co-owner, David Regn, testified that this document essentially embodies Stream's 16 years of work in the advertising industry.  This document contained a variety of trade secret protectable information including: information about Stream's revenue; Stream's client list and revenue for each client; Stream's client marketing strategies; and Streams prospective client list and strategy for those clients.  *See Bimbo Bakeries*, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *10 (finding cost positions, prospective client lists, profit strategies, and per-unit costs and profits trade secret protectable); *SI Handling Sys., Inc. v. Heisley,* 753 F.2d 1244, 1260 (3d Cir. 1985) (pricing methods and service-specific profit margins qualify as trade secret information); *Air Prds. & Chems., Inc. v. Johnson*, 296 Pa. Super. 405, 442 A.2d 1114, 1121-22 (Pa. Super. Ct. 1982) (spending priorities and budgets for certain divisions trade secret protectable).

Defendants argue that these documents are not protected trade secrets because Stream did not require them to sign any documents to protect this information, such as non-compete clauses and confidentiality agreements.  However, Stream took reasonable safety precautions under the circumstances to ensure these documents could not be accessed by the public.  As noted in the Findings of Fact, all of these documents were available only on Stream's internal server, the W:Drive.  One could only access the W:Drive if they were a Stream employee and had been given a password protected username.  Stream employees could only access the W:Drive on

18

computers at Stream's headquarters, unless they were granted special VPN access.  Even if given

VPN access, the size of files one could access was controlled.  In short, these documents could

only be accessed through the employer-employee relationship Stream fostered with its

employees.[13]  Even absent confidentiality agreements, Pennsylvania courts routinely enjoin

employees from using trade secreted information, obtained through the employment relationship,

from competing with their employers.  *See BIEC Int'l, Inc. v. Global Steel Services, Ltc.*, 791 F.

Supp. 489, 548 (E.D. Pa. 1992)(Even if there is no written agreement, a court *must* enjoin an

employee from competing with their ex-employer through use of the ex-employer's trade

secrets).

　　　　This Court also notes that, considering the time frame in which the information was

downloaded, there was no legitimate reason for Cresta and Lorenz to have downloaded a

majority of these documents.  Cresta and Lorenz were well under way in their planning to launch

a business to compete directly with Stream.  Both Cresta and Lorenz actively concealed from

Stream their plans to start the competing advertising agency, even when tendering their

resignations to Stream.[14]  On their final days - and even in their final minutes - as Stream

employees, Cresta and Lorenz secretly downloaded large amounts of Stream's information.[15]

---

[13]  One Stream employee, Mr. Barrilla, testified that the culture at Stream was that
employees only accessed documents needed for projects.  N.T. 10/31/12 Barilla at 103.  Lorenz
also testified that when he trained employees he made sure they knew the server and information
on it was private to Stream.  N.T. 10/31/12 Lorenz at 140.

[14]  Both Cresta and Lorenz affirmatively misstated their post-Stream employment plans.
Cresta claimed he would be making "skateboard movies," and Lorenz stated he would be joining
an established advertising agency.

[15]  Even when confronted by Brennan, Lorenz did not admit to misappropriating Stream's
information, and assured Cresta that he "stuck to his story" of leaving to consider offers from two

The defendants exploited their employee status with Stream to access, copy and take with them some of Stream's most important business information.  Despite knowing that the W:Drive and information on it was only accessible by Stream employees, they took hundreds of documents off of the server and went to great lengths to hide their actions from Stream.

To be sure, Stream could have taken additional measures to protect against the theft of their information; such as requiring employees to sign confidentiality agreements and enhancing their computer safeguards.  However, given these facts and circumstances presented in this case, this Court finds that Stream took adequate measures to keep their information private.  The absence of confidentiality agreements in this case does not serve to deny Stream trade secret protection.  *See Bimbo Bakeries,* 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774 at *29 (finding documents were protected by trade secret that defendant had access to by means of his employment status and copied without informing employer that he was leaving to compete directly with employer); *see also BIEC*, 791 F. Supp. at 548 (finding information was trade secret protected even though no restrictive covenant was signed).  Furthermore, Cresta and Lorenz were trusted professional employees, occupying senior management positions within Stream.  Certainly, at one point, Cresta and Lorenz had legitimate business reasons to access the information at issue here.  The record contains numerous examples of overt acts of disloyalty to Stream on the part of Cresta and Lorenz.[16]  It is difficult to conceive of computer safeguards that

---

advertising agencies.  Pl. Ex. 30.

[16] Cresta and/or Lorenz worked to steal Stream's clients while working for Stream (indeed, they did so while "on the clock" as Stream employees); capitalized on business leads that came to them in their capacity as Stream employees; rejoiced in Stream's failures; actively misled Stream's principals as to their post-Stream employment plans;

could have effectively guarded against the actions of Cresta and Lorenz.[17]

Misappropriation of a trade secret under PUTSA is defined as:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means
> (2) Disclosure of a trade secret of another without express or implied consent by a person who:
>> (i) Used improper means to acquire knowledge of the trade secret;
>> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>> (A) derived from or through a person who had utilized improper means to acquire it;
>>> (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
>>> C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Sta. Ann. § 5302. A court may enjoin both actual misappropriation as well as threatened misappropriation. 12 Pa. Cons. Stat. Ann. § 5302. "The proper inquiry in determining whether to grant an injunction to prevent the threatened disclosure of trade secrets is 'whether there is sufficient likelihood, or substantial threat' of a defendant disclosing trade secrets." *Bimbo Bakeries*, 613 F.3d at 104 (*citing Den-Tal-Ez*, 566 A.2d at 1232; *Air Prods.*, 442 A.2d at 1122-25; *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1263-64 (3d Cir. 1985)).

This Court finds that, at a minimum, there is ample evidence of record showing threatened misappropriation. As noted in the Findings of Fact, Defendants demonstrated an intention to use confidential information against Plaintiff's by actively keeping their plans to

---

[17] As Regn testified: "I thought that my employees certainly wouldn't look at information downloaded[sic] and take it for their benefit of starting another company." N.T. 10/25/12 Regn at 234.

form a directly competing company from Stream.  They then used their status as employees to copy hundreds documents onto external storage devices.  *See Bimbo Bakeries*, 613 F.3d at 118 (3d Cir. 2012) (affirming district court finding of threatened misappropriation when the record showed defendant failed to disclose his acceptance of an offer at a competitor, continued to receive information after his acceptance, and copied trade secret information onto an external storage device).

This Court further finds that Cresta and Lorenz's conduct demonstrates an intent to use Stream's trade secrets to Stream's detriment.  In the months preceding their exit, Defendants repeatedly demonstrated their intent to start their business at the expense of Stream.  Text message exchanges between the Defendants reveal that Defendants celebrated Stream's failure to sign a new client.  Defendants also actively tried to induce Stream clients to leave Stream while continuing to remain employed by them.  Defendants also worked to solicit a prospective Stream client, Rafferty Subaru, while continuing to remain employed at Stream.  *See Bimbo Bakeries*, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *37, ¶ 13.  Indeed, Cresta was tasked by Stream to help develop a pitch to Rafferty Subaru on behalf of Stream; at the same time, he developed a pitch to Rafferty Subaru on behalf of Windward.

Finally, an inference that Defendants intend to use Stream's trade secrets against them can be drawn from the fact that Defendants have not produced seven external storage devices, their iPhones, iPads and/or the personal computers they used prior to July 16, 2012, even despite orders from the District Court that such information be produced for imaging.  *See Bimbo Bakeries*, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *38, ¶ 14 ("fact that one of the external devices onto which Defendant copied Bimbo's trade secret information has not been

recovered or returned to Bimbo, supports the inference that Defendant intends to use those trade secrets at [a direct competitor]")

In sum, Defendants left Stream with highly confidential and proprietary information. The information they took was valuable to Stream, accessible only by Stream employees, and would be very harmful to Stream if in a competitors hands. Defendants repeatedly worked to compete with Stream and failed to disclose their plans to Stream; all while exploiting their status as Stream employees to access and take with them hundreds of documents.

Accordingly, Stream has established a likelihood of success on their claim of trade secret misappropriation.

b.      **Irreparable Harm**

Next, this Court must determine if Plaintiff will suffer irreparable harm if an injunction is not issued. "Harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages." *Bimbo Bakeries*, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *43 (*quoting National Business Services, Inc. v. Wright*, 2 F.Supp. 2d 701 (E.D. Pa. 1998) (*citing Albert E. Price, Inc. v. Metzner*, 574 F. Supp. 281, 289 (E.D. Pa. 1983))). The inquiry examines whether Plaintiff will suffer irreparable harm at the time a preliminary injunction would issue.

Here, Stream has shown that Defendants intend to use its trade secrets against it. As noted previously, their conduct of taking Stream's confidential information to form a competing advertising agency, while keeping their plans secret, shows that Defendants intend to use Stream's trade secrets against them. *See SI Handling Systems, Inc.* 753 F.2d at 1264 (finding

23

irreparable harm where plaintiff "made an ample showing that appellants intended to use its trade secrets and did not intend to take reasonable measures to preserve their secret status"); *see also Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191-92 (5th Cir. 1984) (applying Pennsylvania law).  Additionally, the timing of Cresta and Lorenz's extensive downloading of documents further supports the notion that Stream will suffer irreparable harm due to Defendants use of the information.  Indeed, Defendants downloaded these documents close to or immediately following their resignations, and these same documents then appeared on their Windward computers shortly thereafter.  *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-94 (3d Cir. 1992) ("intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm").

Furthermore, the nature of the misappropriated trade secrets supports a finding of irreparable harm.  Stream's pricing strategies and profit margins would allow Defendants to not only anticipate and improve upon Stream's bids to prospective clients, but also sour Stream's relationships with current clients.  *See Bimbo Bakeries*, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *43.  Information such as client specific strategies would also allow them to compete against Stream for similar clients without incurring the costs of developing such strategies over sixteen years.  *See Id.*  Both parties agree that the local advertising industry is highly competitive. Defendants use of Stream's pricing and marketing strategies – which took Stream over sixteen years to develop – would irreparably harm Stream by improperly using Stream's own proprietary information to improve Windward's competitive standing in relation to Stream, and in the local industry in general.  *See Id.* at *44-45.

Finally, this Court cannot determine the full extent of the trade secreted information taken

because Defendants have failed to produce a large amount of the devices used to misappropriate the information.  Defendants have not produced any evidence that they returned any of Stream's proprietary information to them.[18]  On the contrary, Defendants argued they were entitled to take and use the information because they did not believe any of it was confidential.

Based on the foregoing, this Court finds that Stream will be irreparably harmed absent the issuance of an injunction.

### c.    Balance of Harms

Stream seeks a limited preliminary injunction barring Defendants from servicing or soliciting to serve any person or entity other than a select group of clients and prospective clients.[19]  The harm of Stream's trade secrets being used in direct competition outweighs the harm to Defendants from not being able to solicit clients using Stream's confidential information. *See Bimbo Bakeries*, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *46.  Indeed, the limited scope of the Stream's request for the preliminary injunction minimizes the harm to Defendants.  In *Bimbo Bakeries*, a case involving analogous facts, the Court enjoined the defendant from working <u>at all</u> in competition with his employer.  *Id.*  Stream seeks a more limited injunction than that which was issued in *Bimbo*.  Defendants are not totally prohibited from working in the advertising industry, or from soliciting the clients they already have begun soliciting.  Thus, Windward is not barred from entering the marketplace entirely.

---

[18]  Defendants claim to have lost or disposed of electronic storage devices, hard drives, and computers.

[19]  Specifically, Stream seeks to enjoin Defendants from servicing or soliciting to service any person or entity other than Rafferty, Center for Resolutions, Warwick Jewelers, Armen Cadillac, Jeff D'Ambrosio, and the O'Reillys businesses.  Pl. Prop. Finding of Fact and Conclusion of law at 119.

The irreparable harm to Stream from the use of its trade secrets by Defendants outweighs any perceived harm to Defendants.

### d.      The Public Interest Favors the Issuance of the Injunction

This Court is satisfied that the public interest favors the granting of a preliminary injunction.  Where the elements of a trade secret claim are established "extensive precedent supports an injunctive remedy."  *SI Handling Sys.,* 753 F.2d at 1265.  Similarly, the public interest in upholding and protecting trade secrets from unlawful misappropriation also supports an injunction.  *Bimbo Bakeries*, 2010 U.S. Dist. LEXIS 68990, 2010 WL 571774, at *46-47; *see also Air Prods. & Chem, Inc.*, 2003 WL 22917491, at *14 (public interest leans more toward granting injunction where plaintiff has demonstrated a likelihood of success on the merits.).  Finally, the Third Circuit has found the public interest to favor the imposition of injunctive relief in situations where a new business venture's profitability is dependant on the use of a competitors trade secrets.  *Id.* (*citing Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960)).

### B.      Breach of the Duty of Loyalty

### a.      Likelihood of Success

Stream claims that Cresta and Lorenz breached the duty of loyalty they owed as employees of Stream.  The duty of loyalty is a fiduciary duty that is implied in an agency relationship between an employer and it's employees.  *See Colgate Palmolive Co. v. Tandem Indus.*, 2012 U.S. App. LEXIS 11290, 2012 WL 1995021, at *6 (3d Cir. June 5, 2012) (duty is inherent to the employer-employee relationship and is not something that one can reject).  To hold Defendants liable for breaches of a fiduciary duty, Stream must prove that:

(1) Defendants negligently or intentionally failed to act in good faith and solely

26

> for the benefit of Plaintiffs in all matters for which they were employed;
> (2) Plaintiff's suffered injury; and
> (3) Defendants failure to act solely for Plaintiff's benefit was a real factor in bringing about Plaintiff's injuries.

*Id.* (*citing* Pa. S.S.C.J.I § 6.210 (2011)).  In other words, an agent must act with the utmost good faith in furthering and advancing the principal's interests.  *Sylvester v. Beck*, 406 Pa. 607, 610-11, 178 A.2d 755, 757 (1962).  The duty of loyalty encompasses a variety of conduct; an agent cannot steal the principal's business opportunity and must disclose to the principal all relevant information.  *See Colgate Palmolive Co.*, 2012 U.S. App. LEXIS 11290, 2012 WL 1995021, at *7 (Misappropriation of business belonging to one's employer is clear breach of duty of loyalty.); *Borden v. Sinskey*, 530 F.2d 478, 489-90 (3d Cir. 1976) (usurping corporate business opportunity violates the duty of loyalty); *Sylvester,* 406 Pa. at 610-11, 178 A.2d at 757 (1962) (duty of loyalty includes disclosing to the principal all relevant information).

In the instant case, Cresta and Lorenz were in an agency relationship with Stream by virtue of their status as Stream employees.  *See Pennsylvania Nurses Ass'n v. Pennsylvania State Educ. Ass'n*, 90 F.3d 797, 807 (3d Cir. 1996) ("Pennsylvania law recognizes, under agency principles, a duty of loyalty by an employee to an employer.").  As noted in the Findings of Fact, Defendants engaged in conduct that violated the duty of loyalty they owed to Stream.  When Lorenz received a lead for a prospective client on his Stream e-mail, he failed to pass this information along to Stream; rather, he had the lead e-mailed to the private e-mail accounts of Cresta and himself.[20]  Defendants also began creating a wedge between Stream and its clients, resulting in the loss of the O'Reilly's as a Stream client.  *See Byrd v. Johnston*, 2009 U.S. Dist.

_____

[20]  Regn testified that typically when a lead was received for Stream it would be passed along to the appropriate people in the sales department.

27

LEXIS 45960 (E.D. Pa. May 29, 2009) (duty breached when one interferes with principal's performance).  Defendants then went further, beginning to secretly solicit and convert Stream's current clients to join their new advertising agency.[21]

Additionally, text message conversations between Cresta and Lorenz showed that they rejoiced in Stream's failed bid to sign at least one new client.  In a particularly telling exchange, Lorenz stated to Cresta, "F*** them," to which Cresta replied "don't worry, we're going to."  *See* Pl. Ex. 30 at 521.  This typified the activity and attitude of the two in the final months of their employment at Stream.

Perhaps the most blatant breach of loyalty occurred in Cresta and Lorenz's solicitation of Rafferty Subaru, a prospective client of Stream.  While both of the Defendants remained employed at Stream, they undertook secret efforts to solicit and sign Rafferty as a client for their new advertising agency.  At the outset, Cresta learned in the first days of July that Rafferty was an open account, and failed to pass ths information along to Stream employees.  *See Barker v. Altegra Credit Co.* (In Re Barker), 251 B.R. 250, 265-66 (E.D. Pa. 2000) (duty of loyalty requires agent to promptly advise the principal of all relevant facts and circumstances known to agent).  Then, when Rafferty Subaru came to Stream headquarters for a meeting, Cresta was given an assignment by Stream to assist Stream in the solicitation of Rafferty Subaru.  Cresta took on the assignment without mentioning that he was also working to solicit Rafferty Subaru for his own advertising agency.  Evidence shows that both Cresta and Lorenz put substantial time and effort into the preparation of a deck for their own presentation to Rafferty Subaru, despite the fact that

---

[21]  Cresta converted two Stream clients, representing six thousand dollars of business per month.  Cresta also attempted to convert Tarmac, while Lorenz "took the temperature" of Jack Williams.

Lorenz was still employed at Stream. *See Platinum Mgmt., Inc. v. Dahms* 666 A.2d 1028, 1042 (N.J. Super. Ct. Law Div.) ("Although an employee has the right to make preparations to go into a competing business even while he is still employed, he may not breach the undivided duty of loyalty he owes his employer while still employed, by soliciting his employer's customers or other acts of secret competition.").

This secret solicitation and subsequent deal between Windward and Rafferty was formed and negotiated almost exclusively during either Cresta or Lorenz's employment at Stream. Cresta and Lorenz's solicitation and deal with Rafferty advanced their own interests along with those of their new ad agency. *See Katz v. Food Sciences Corp.*, 2000 U.S. Dist. LEXIS 10285, 2000 WL 1022986, at *16-17 (E.D. Pa. July 13, 2000) (noting that a secret deal itself is sufficient evidence to conclude injury because it provided a competitor with profit). Furthermore, the secretive nature in which they operated cannot be considered as acting with "utmost good faith." *See Id.* at *17 ("the covert and deceitful manner in which Katz managed the agreement hardly qualifies as acting with utmost good faith.").

Defendants unauthorized use of Stream's trade secreted and confidential information to establish Windward constitutes another breach of the duty of loyalty. *See Pollack v. Skinsmart Dermatology and Aesthetic Center P.C.*, 68 Pa. D. & C.4th 417 (2004) (defendants use of trade secreted patient list to form own clinic was "clear violation of duty of loyalty," as was taking their employers patients whom they did not bring with them to the practice). While the duty of loyalty generally terminates at the end of the agency relationship, the duty of an agent not to compete with the principal using the principals trade secrets outlasts the agency relationship. *Id.* at 429 (*citing* Restatement (Second) of Agency § 396 comment b). Accordingly, Defendants

continue to have a duty to Stream to not use their trade secrets to compete with them.

It is clear that the Defendants' breach of their duty of loyalty harmed Stream.  Stream has lost multiple clients due to the defendants conduct.  Stream also failed in their bids on other prospective clients.  Cresta and Lorenz's conduct resulted in a client going to a direct competitor, Windward.  *See Katz*, 2000 U.S. Dist. LEXIS 10285, 2000 WL 1022986, at *16-17  (advancing interests of a competitor is harmful to the employer).  Finally, Cresta and Lorenz took hundreds of confidential documents belonging to Stream that now are in the possession of a direct competitor.[22]

### b.    Irreparable Harm

While Stream has demonstrated that they were harmed by Defendant's disloyal conduct, most of the damages resulting from the breach can be put in monetary terms, such as lost client revenue.[23]  However, Pennsylvania courts "have long recognized that the use of confidential material obtained by an employee from a position of trust and confidence may not be used in later competition to the prejudice of his employer."  *Carl A. Colteryahn Dairy, Inc. v. SchneDer Dairy*, 203 A.2d 469, 471 (Pa. 1964).  An employer is entitled to enjoin an employee against the

---

[22]  As noted above in the discussion of trade secret misappropriation, the exact number of documents taken by Cresta and Lorenz, which are still in their possession, cannot be determined, due to Defendants' failure to produce the majority of devices they used to download documents from the Stream database.

[23]  This Court notes that the loss of customer relationships from Cresta and Lorenz's conduct has been held to be unascertainable and incapable of monetary losses.  *See John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977).  Nevertheless, this Court finds that Plaintiff's have not put forth sufficient evidence regarding the "possible consequences" of their lost client relationships aside from the loss of the clients themselves.

competitive use of their confidential information.[24]  *See Hagy v. Premier Mfg. Corp.*, 172 A.2d

283, 287-88 (Pa. 1961); *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277,

1287-88 (Pa. 1992) ("a fiduciary who breaches his duty of loyalty to his principal is liable to his

principle, and an injunction is a proper remedy for the breach").  Because Defendants took

confidential, as well as trade secreted, information for use in their new agency and because they

have displayed an intention to make imminent and continued use of this information, Stream has

demonstrated that they will suffer irreparable harm absent an injunction.[25]

       **c.**     **Harm to Plaintiffs**

As noted above in the discussion of trade secret misappropriation, the scope of Stream's

proposed injunction has been narrowed such that any harm to Defendants does not outweigh the

harm the Plaintiff's will suffer from disclosure of their trade secrets.

       **d.**     **Public Interest**

This Court is satisfied that the public interest favors the protection of confidential

information and the protection of the duty of loyalty inherent in the employer-employee

relationship.  Additionally, since Stream has demonstrated a likelihood of success on the merits,

the public interest favors the granting of an injunction to prevent the exploitation of confidential

relationships in the competitive marketplace.  *Cf. Air Prods. & Chem, Inc.*, 2003 WL 22917491,

at *14.

---

[24]  Note that the confidential information need not constitute a trade secret to qualify for injunctive relief.  *See Carl A.*, 203 A.2d at 471.

[25]  *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992) (an intention to make imminent or continued use of a trade secret or disclose it to a competitor will almost certainly show immediate irreparable harm).

IV.    **CONCLUSION**

For the foregoing reasons, this Court recommends that Plaintiff's Motion for a

Preliminary Injunction be **GRANTED**.

This Court recommends that Defendants be immediately restrained and enjoined from

doing any of the following:

(1) Soliciting any entity or person other than Rafferty Subaru, Center for Resolutions,

Warwick Jewelers, Armen Cadillac, Jeff D'Ambrosio, and the O'Reillys' advertising

businesses until such time as the Court enters an order as to Stream's request for a final

injunction.[26]

(2) Accessing or using any confidential information or documents learned from or

obtained from Stream.

It is further recommended that Defendants be required to return any confidential and

proprietary information belonging to Plaintiff in their possession or control, in whatever form

that information exists, including but not limited to physical or electronic documents and copies

thereof.

Therefore, I make the following:

---

[26]   This Court acknowledges that the relief recommended proposes a significant
restriction on Defendants' business opportunities.   This broad relief is recommended because of
the scope of the misappropriation of information by Defendants.  More importantly, because so
many electronic storage devices have not been produced in this litigation, a more narrowly-
structured injunction would not sufficiently protect Plaintiff.  *See Bimbo Bakeries,* 2010 WL
571774 at *47.

## R E C O M M E N D A T I O N

AND NOW, this 7th day of February, 2013, **IT IS RESPECTFULLY**

**RECOMMENDED** that Plaintiff's Motion for a Preliminary Injunction against Defendants

(Doc. No. 2) be **GRANTED**.

BY THE COURT:

/s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE